## POWELL v. PENNSYLVANIA.

ERROR TO THE SUPREME COURT OF PENNSYLVANIA.

No. 914. Argued January 4, 1888. — Decided April 9, 1888.

The Fourteenth Amendment to the Constitution was not designed to interfere with the exercise of the police power by the State for the protection of health, the prevention of fraud, and the preservation of the public morals.

The prohibition of the manufacture out of oleaginous substances, or out of any compound thereof other than that produced from unadulterated milk or cream from unadulterated milk, of an article designed to take the place of butter or cheese produced from pure unadulterated milk or cream from unadulterated milk; or the prohibition upon the manufacture of any imitation or adulterated butter or cheese, or upon the selling or offering for sale, or having in possession with intent to sell, the same, as an article of food, is a lawful exercise by the State of the power to protect, by police regulations, the public health.

Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the act of the legislature of Pennsylvania of May 21, 1885, (Laws of Penn. of 1885, p. 22, No. 25,) is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy, which belong to the legislative department to determine.

The Statute of Pennsylvania of May 21, 1885, "for the protection of the public health, and to prevent adulteration of dairy products and fraud in the sale thereof" neither denies to persons within the jurisdiction of the State the equal protection of the laws; nor deprives persons of their property without that compensation required by law; and is not repugnant in these respects to the Fourteenth Amendment to the Constitution of the United States.

THE case is stated in the opinion.

*Mr. D. T. Watson* and *Mr. Lyman D. Gilbert* for plaintiff in error. *Mr. W. B. Rodgers* was with them on the brief.

*Mr. Wayne MacVeagh* for defendant in error. *Mr. A. H. Wintersteen* was with him on the brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

This writ of error brings up for review a judgment of the Supreme Court of Pennsylvania, sustaining the validity of a statute of that Commonwealth relating to the manufacture and sale of what is commonly called oleomargarine butter. at judgment, the plaintiff in error contends, denies to him certain rights and privileges specially claimed under the Fourteenth Amendment to the Constitution of the United States.

By acts of the General Assembly of Pennsylvania, one approved May 22, 1878, and entitled "An act to prevent deception in the sale of butter and cheese," and the other approved May 24, 1883, and entitled "An act for the protection of dairymen, and to prevent deception in sales of butter and cheese," provision was made for the stamping, branding, or marking, in a prescribed mode, manufactured articles or substances in semblance or imitation of butter or cheese, not the legitimate product of the dairy, and not made exclusively of milk or cream, but into which oil, lard, or fat, not produced from milk or cream, entered as a component part, or into which melted butter or any oil thereof had been introduced to take the place of cream. Laws of Pennsylvania, 1878, p. 87; 1883, p. 43.

But this legislation, we presume, failed to accomplish the objects intended by the legislature. For, by a subsequent act, approved May 21, 1885, and which took effect July 1, 1885, entitled "An act for the protection of the public health and to prevent adulteration of dairy products and fraud in the sale thereof," Laws of Pennsylvania, 1885, p. 22, No. 25, it was provided, among other things, as follows :

"SECTION 1. That no person, firm, or corporate body shall manufacture out of any oleaginous substance or any compound of the same, other than that produced from unadulterated milk or of cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk or cream from the same, or of any imitation or adulterated butter or cheese, nor shall sell or offer for sale, or have in his, her, or their possession, with intent to sell the same, as an article of food.

" SECTION 2. Every sale of such article or substance, which is prohibited by the first section of this act, made after this act shall take effect, is hereby declared to be unlawful and void, and no action shall be maintained in any of the courts in this State to recover upon any contract for the sale of any such article or substance.

" SECTION 3. Every person, company, firm, or corporate body who shall manufacture, sell, or offer or expose for sale or have in his, her, or their possession with intent to sell, any substance, the manufacture and sale of which is prohibited by the first section of this act, shall, for every such offence, forfeit and pay the sum of one hundred dollars, which shall be recoverable with costs by any person suing in the name of the Commonwealth as debts of like amounts are by law recoverable; one-half of which sum, when so recovered, shall be paid to the proper county treasurer for the use of the county in which suit is brought and the other half to the person or persons at whose instance such a suit shall or may be commenced and prosecuted to recovery.

" SECTION 4. Every person who violates the provisions of the first section of this act, shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than one hundred dollars, nor more than three hundred, or by imprisonment in the county jail for not less than ten nor more than thirty days, or both such fine and imprisonment for the first offence, and imprisonment for one year for every subsequent offence."

The plaintiff in error was indicted, under the last statute, in the Court of Quarter Sessions of the Peace in Dauphin County, Pennsylvania. The charge in the first count of the indictment is, that he unlawfully sold, " as an article of food, two cases, containing five pounds each, of an article designed to take the place of butter produced from pure, unadulterated milk or cream from milk, the said article so sold, as aforesaid, being an article manufactured out of certain oleaginous substances and compounds of the same other than that produced from unadulterated milk or cream from milk, and said article so sold, as aforesaid, being an imitation butter." In the

second count the charge is that he unlawfully had in his pos-session, " with intent to sell the same, as an article of food, a quantity, viz., one hundred pounds, of imitation butter, de-signed to take the place of butter produced from pure, unadul-terated milk or cream from the same, manufactured out of certain oleaginous substances, or compounds of the same other than that produced from milk or cream from the same."

It was agreed, for the purposes of the trial, that the defend-ant, on July 10, 1885, in the city of Harrisburg, sold to the prosecuting witness, as an article of food, two original pack-ages of the kind described in the first count; that such pack-ages were sold and bought as butterine, and not as butter pro-duced from pure, unadulterated milk or cream from unadul-terated milk; and that each of said packages was, at the time of sale, marked with the words, "Oleomargarine Butter," upon the lid and side in a straight line, in Roman letters half an inch long.

It was also agreed that the defendant had in his possession one hundred pounds of the same article, with intent to sell it as an article of food.

This was the case made by the Commonwealth.

The defendant then offered to prove by Prof. Hugo Blanck that he saw manufactured the article sold to the prosecuting witness; that it was made from pure animal fats; that the process of manufacture was clean and wholesome, the article containing the same elements as dairy butter, the only differ-ence between them being that the manufactured article con-tained a smaller proportion of the fatty substance known as butterine; that this butterine existed in dairy butter in the proportion of from three to seven per cent, and in the manu-factured article in a smaller proportion, and was increased in the latter by the introduction of milk and cream; that this having been done, the article contained all the elements of butter produced from pure unadulterated milk or cream from the same except that the percentage of butterine was slightly smaller; that the only effect of butterine was to give flavor to the butter and that it had nothing to do with its wholesome-ness; that the oleaginous substances in the manufactured arti-

cle were substantially identical with those produced from milk or cream; and that the article sold to the prosecuting witness was a wholesome and nutritious article of food, in all respects as wholesome as butter produced from pure unadulterated milk or cream from unadulterated milk.

The defendant also offered to prove that he was engaged in the grocery and provision business in the city of Harrisburg, and that the article sold by him was part of a large and valuable quantity manufactured prior to the 21st of May, 1885, in accordance with the laws of this Commonwealth relating to the manufacture and sale of said article, and so sold by him; that for the purpose of prosecuting that business large investments were made by him in the purchase of suitable real estate, in the erection of proper buildings, and in the purchase of the necessary machinery and ingredients; that in his traffic in said article he made large profits; and, if prevented from continuing it, the value of his property employed therein would be entirely lost, and he be deprived of the means of livelihood.

To each offer the Commonwealth objected upon the ground that the evidence proposed to be introduced was immaterial and irrelevant.

The purpose of these offers of proof was avowed to be: (1) To show that the article sold was a new invention, not an adulteration of dairy products, nor injurious to the public health, but wholesome and nutritious as an article of food, and that its manufacture and sale were in conformity to the acts of May 22, 1878, and May 24, 1883. (2) To show that the statute upon which the prosecution was founded, was unconstitutional, as not a lawful exercise of police power, and, also, because it deprived the defendant of the lawful use "of his property, liberty, and faculties, and destroys his property without making compensation."

The court sustained the objection to each offer, and excluded the evidence. An exception to that ruling was duly taken by the defendant.

A verdict of guilty having been returned, and motions in arrest of judgment and for a new trial having been overruled,

the defendant was adjudged to pay a fine of one hundred dollars and costs of prosecution, or give bail to pay the same in ten days, and be in custody until the judgment was performed. That judgment was affirmed by the Supreme Court of the State. 114 Penn. St. 265.

This case, in its important aspects, is governed by the principles announced in *Mugler* v. *Kansas*, 123 U. S. 623.

It is immaterial to inquire whether the acts with which the defendant is charged were authorized by the statute of May 22, 1878, or by that of May 24, 1883. The present prosecution is founded upon the statute of May 21, 1885 ; and if that statute be not in conflict with the Constitution of the United States, the judgment of the Supreme Court of Pennsylvania must be affirmed.

It is contended that the last statute is void in that it deprives all coming within its provisions of rights of liberty and property without due process of law, and denies to them the equal protection of the laws ; rights which are secured by the Fourteenth Amendment to the Constitution of the United States.

It is scarcely necessary to say that if this statute is a legitimate exercise of the police power of the State for the protection of the health of the people, and for the prevention of fraud, it is not inconsistent with that Amendment ; for it is the settled doctrine of this court that, as government is organized for the purpose, among others, of preserving the public health and the public morals, it cannot divest itself of the power to provide for those objects ; and that the Fourteenth Amendment was not designed to interfere with the exercise of that power by the States. *Mugler* v. *Kansas*, 123 U. S. 663 ; *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746, 751 ; *Barbier* v. *Connolly*, 113 U. S. 27 ; *Yick Wo* v. *Hopkins*, 118 U. S. 356.

The question, therefore, is whether the prohibition of the manufacture out of oleaginous substances, or out of any compound thereof other than that produced from unadulterated milk or cream from unadulterated milk, of an article designed to take the place of butter or cheese produced from pure un-

adulterated milk or cream from unadulterated milk, or the prohibition upon the manufacture of any imitation or adulterated butter or cheese, or upon the selling or offering for sale, or having in possession with intent to sell, the same, as an article of food, is a lawful exercise by the State of the power to protect, by police regulations, the public health.

The main proposition advanced by the defendant is that his enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade, and of acquiring, holding, and selling property, is an essential part of his rights of liberty and property, as guaranteed by the Fourteenth Amendment. The court assents to this general proposition as embodying a sound principle of constitutional law. But it cannot adjudge that the defendant's rights of liberty and property, as thus defined, have been infringed by the statute of Pennsylvania, without holding that, although it may have been enacted in good faith for the objects expressed in its title, namely, to protect the public health and to prevent the adulteration of dairy products and fraud in the sale thereof, it has, in fact, no real or substantial relation to those objects. *Mugler* v. *Kansas*, 123 U. S. 623, 661. The court is unable to affirm that this legislation has no real or substantial relation to such objects.

It will be observed that the offer in the court below was to show by proof that the particular articles the defendant sold, and those in his possession for sale, in violation of the statute, were, in fact, wholesome or nutritious articles of food. It is entirely consistent with that offer that many, indeed, that most kinds of oleomargarine butter in the market contain ingredients that are or may become injurious to health. The court cannot say, from anything of which it may take judicial cognizance, that such is not the fact. Under the circumstances disclosed in the record, and in obedience to settled rules of constitutional construction, it must be assumed that such is the fact. "Every possible presumption," Chief Justice Waite said, speaking for the court in Sinking Fund Cases, 99 U. S. 700, 718, "is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt.

One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." See, also, *Fletcher* v. *Peck*, 6 Cranch, 87, 128; *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 625; *Livingston* v. *Darlington*, 101 U. S. 407.

Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts. It is not a part of their functions to conduct investigations of facts entering into questions of public policy merely, and to sustain or frustrate the legislative will, embodied in statutes, as they may happen to approve or disapprove its determination of such questions. The power which the legislature has to promote the general welfare is very great, and the discretion which that department of the government has, in the employment of means to that end, is very large. While both its power and its discretion must be so exercised as not to impair the fundamental rights of life, liberty, and property; and while, according to the principles upon which our institutions rest, "the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself;" yet, "in many cases of mere administration, the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judg-

ment, exercised either in the pressure of public opinion or by means of the suffrage." *Yick Wo.* v. *Hopkins*, 118 U. S. 370. The case before us belongs to the latter class. The legislature of Pennsylvania, upon the fullest investigation, as we must conclusively presume, and upon reasonable grounds, as must be assumed from the record, has determined that the prohibition of the sale, or offering for sale, or having in possession to sell, for purposes of food, of any article manufactured out of oleaginous substances or compounds other than those produced from unadulterated milk or cream from unadulterated milk, to take the place of butter produced from unadulterated milk or cream from unadulterated milk, will promote the public health, and prevent frauds in the sale of such articles. If all that can be said of this legislation is that it is unwise, or unnecessarily oppressive to those manufacturing or selling wholesome oleomargarine, as an article of food, their appeal must be to the legislature, or to the ballot-box, not to the judiciary. The latter cannot interfere without usurping powers committed to another department of government.

It is argued, in behalf of the defendant, that if the statute in question is sustained as a valid exercise of legislative power, then nothing stands in the way of the destruction by the legislative department of the constitutional guarantees of liberty and property. But the possibility of the abuse of legislative power does not disprove its existence. That possibility exists even in reference to powers that are conceded to exist. Besides, the judiciary department is bound not to give effect to statutory enactments that are plainly forbidden by the Constitution. This duty, the court has said, is always one of extreme delicacy; for, apart from the necessity of avoiding conflicts between coördinate branches of the government, whether state or national,- it is often difficult to determine whether such enactments are within the powers granted to or possessed by the legislature. Nevertheless, if the incompatibility of the Constitution and the statute is clear or palpable, the courts must give effect to the former. And such would be the duty of the court if the state legislature, under the pretence of guarding the public health, the public morals, or the

public safety, should invade the rights of life, liberty, or property, or other rights, secured by the supreme law of the land.

The objection that the statute is repugnant to the clause of the Fourteenth Amendment forbidding the denial by the State to any person within its jurisdiction of the equal protection of the laws, is untenable. The statute places under the same restrictions, and subjects to like penalties and burdens, all who manufacture, or sell, or offer for sale, or keep in possession to sell, the articles embraced by its prohibitions; thus recognizing and preserving the principle of equality among those engaged in the same business. *Barbier* v. *Connolly*, 113 U. S. 27; *Soon Hing* v. *Crowley*, 113 U. S. 703; *Missouri Pacific Railway Co.* v. *Humes*, 115 U. S. 512, 519.

It is also contended that the act of May 21, 1885, is in conflict with the Fourteenth Amendment in that it deprives the defendant of his property without that compensation required by law. This contention is without merit, as was held in *Mugler* v. *Kansas.*

Upon the whole case, we are of opinion that there is no error in the judgment, and it is, therefore,

*Affirmed.*

Mr. Justice Field dissenting.

The plaintiff in error was indicted in one of the courts of Pennsylvania for selling as an article of food two cases of oleomargarine butter, containing five pounds each, and was sentenced to pay a fine of one hundred dollars. The case being taken to the Supreme Court of the State, the judgment was affirmed, and to review it the case is brought to this court.

The statute, under which the conviction was had, was passed on the 21st of May, 1885, and went into effect on the first of July following. It declares in its first section: " That no person, firm, or corporate body shall manufacture out of any oleaginous substance, or any compound of the same, other than that produced from unadulterated milk or cream from the same, any article designed to take the place of butter or cheese produced from pure, unadulterated milk, or cream from the same, or of any imitation or adulterated butter or cheese,

nor shall sell or offer for sale, or have in his, her, or their possession with intent to sell the same as an article of food."

In another section the act made a violation of these provisions a misdemeanor punishable by a fine of not less than one hundred dollars, nor more than three hundred, or by imprisonment in the county jail for not less than ten or more than thirty days, or both such fine and imprisonment for the first offence, and imprisonment for one year for every subsequent offence.

The act, it is to be observed, is not designed to prevent any deception in the manufacture and sale of the article of oleomargarine butter, or any attempt to pass it off as butter made of milk or cream. The title would indicate that the act was intended for the protection of the public health, and to prevent the adulteration of dairy products, and fraud in the sale thereof. It is probable that the original draft of the act had such a purpose, and that the title was allowed to remain, after its body was changed. Be this as it may, the act is one prohibiting the manufacture or sale, or keeping for sale, of the article, though no concealment is attempted as to its character, nature, or ingredients. Its validity is rested simply upon the fact that it has pleased the legislature of the Commonwealth to declare that the article shall not be manufactured or sold or kept for sale within its limits. On the trial the defendant offered to prove by competent witnesses that the article manufactured was composed of ingredients perfectly healthy, and was as wholesome and nutritious as butter produced from pure milk or cream. But the court refused to allow the evidence, on the ground that it was immaterial and irrelevant. It was sufficient, in its judgment, that the legislature had passed the act, to render a disregard of its provisions a public offence.

The defendant also offered to prove that the article sold by him was a part of a large and valuable quantity manufactured prior to the passage of the act of May 21, 1885, in accordance with the laws of the Commonwealth relating to the manufacture and sale of the article; but this offer was also rejected on the same ground, as immaterial and irrelevant. The case is therefore to be considered as if the proof offered had been received. *Scotland County* v. *Hill*, 112 U. S. 183, 186.

Two questions are thus distinctly presented : first, whether a State can lawfully prohibit the manufacture of a healthy and nutritious article of food designed to take the place of butter, out of any oleaginous substance, or compound of the same, other than that produced from pure milk or cream, and its sale when manufactured? and, second, whether a State can, without compensation to the owner, prohibit the sale of an article of food, in itself healthy and nutritious, which has been manufactured in accordance with its laws?

These questions are not presented in the opinion of the court as nakedly and broadly as here stated, but they nevertheless truly indicate the precise points involved, and nothing else. Upon first impressions one would suppose that it would be a matter for congratulation on the part of the State, that in the progress of science a means had been discovered by which a new article of food could be produced, equally healthy and nutritious with, and less expensive than, one already existing, and for which it could be used as a substitute. Thanks and rewards would seem to be the natural return for such a discovery, and the increase of the article by the use of the means thereby encouraged. But not so thought the legislature of the Commonwealth of Pennsylvania. By the enactment in question it declared that no article of food to take the place of butter shall be manufactured out of any other oleaginous matter than that which is produced from pure milk or cream, or be sold within its limits or kept for sale, under penalty of fine and imprisonment.

If the first question presented can be answered, as it has been by the court, in the affirmative, I do not see why it is not equally within the competency of the legislature to forbid the production and sale of any new article of food, though composed of harmless ingredients, and perfectly healthy and nutritious in its character ; or even to forbid the manufacture and sale of articles of prepared food now in general use, such as extracts of beef and condensed milk, and the like, whenever it may see fit to do so, its will in the matter constituting the only reason for the enactment. The doctrine asserted is nothing less than the competency of the legislature to prescribe out of

different articles of healthy and nutritious food, what shall be manufactured and sold within its limits, and what shall not be thus manufactured and sold. I have always supposed that the gift of life was accompanied with the right to seek and produce food, by which life can be preserved and enjoyed, in all ways not encroaching upon the equal rights of others. I have supposed that the right to take all measures for the support of life, which are innocent in themselves, is an element of that freedom which every American citizen claims as his birthright. I admit that previous to the adoption of the Fourteenth Amendment of the Federal Constitution, the validity of such legislation was to be determined by the constitution of the State, and that its tribunals were the authoritative interpreters of its meaning. This court could exercise no appellate jurisdiction over the judgments of the state courts in matters of purely local concern. Their judgments in such cases were final and conclusive. If the legislation of the State thus sustained was oppressive and unjust, the remedy could be found only in subsequent legislation, brought about through the influence of wiser views and a more enlightened policy on the part of the people. From the structure of our dual government, in which the United States exercise only such powers as are expressly delegated to them by the Constitution, or necessarily implied, all others not prohibited to the States being reserved to them respectively, or to the people, the great mass of matters of local interest were necessarily subject to state regulation, and whether that was wisely or unwisely enacted, it was not a question which could come under the consideration of this court. The government created by the Constitution was not designed for the regulation of matters purely local in their character. The States required no aid from any external authority to manage their domestic affairs. It was only for matters which affected all the States or which could not be managed by them in their individual capacity, or managed only with great difficulty and embarrassment, that a general and common government was desired. Only suc' powers of internal regulation were, therefore, conferred as were essential to the successful and efficient working of the

government established, to facilitate intercourse and commerce between the people of different States, and to secure to them equality of protection in the several States; and only such restraints were placed upon the action of the States as would prevent conflict with its authority, secure the fulfilment of contract obligations, and insure protection against punishment by legislative decree or by retrospective legislation. By the first section of the Fourteenth Amendment, which had its origin in the new conditions and necessities growing out of the late civil war, further restraints were placed upon the power of the States in some particulars, a disregard of which subjected their action to review by this court. That section is as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It is the clause declaring that no State shall "deprive any person of life, liberty, or property without due process of law," which applies to the present case. This provision is found in the constitutions of nearly all the States, and was designed to prevent the arbitrary deprivation of life and liberty, and the arbitrary spoliation of property. As I said on a former occasion, it means that neither can be taken, or the enjoyment thereof impaired, except in the course of the regular administration of the law in the established tribunals. It has always been supposed to secure to every person the essential conditions for the pursuit of happiness, and is therefore not to be construed in a narrow or restricted sense. *Ex parte Virginia,* 100 U. S. 339, 366.

By "liberty," as thus used, is meant something more than freedom from physical restraint or imprisonment. It means freedom not merely to go wherever one may choose, but to do such acts as he may judge best for his interest not inconsistent

with the equal rights of others; that is, to follow such pursuits as may be best adapted to his faculties, and which will give to him the highest enjoyment. As said by the Court of Appeals of New York, in *People* v. *Marx*, "the term 'liberty,' as protected by the Constitution, is not cramped into a mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare," 99 N. Y. 377, 386; and again, *In the matter of Jacobs:* "Liberty, in its broad sense, as understood in this country, means the right not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties, in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or vocation." 98 N. Y. 98.

With the gift of life there necessarily goes to every one the right to do all such acts, and follow all such pursuits, not inconsistent with the equal rights of others, as may support life and add to the happiness of its possessor. The right to pursue one's happiness is placed by the Declaration of Independence among the inalienable rights of man, with which all men are endowed, not by the grace of emperors or kings, or by force of legislative or constitutional enactments, but by their Creator; and to secure them, not to grant them, governments are instituted among men. The right to procure healthy and nutritious food, by which life may be preserved and enjoyed, and to manufacture it, is among these inalienable rights, which, in my judgment, no State can give and no State can take away except in punishment for crime. It is involved in the right to pursue one's happiness. This doctrine is happily expressed and illustrated in *People* v. *Marx*, cited above, where the precise question here was presented. That case arose upon an indictment for a violation of a provision of an act of the legislature of New York, entitled "An act to prevent deception in the sale of dairy products," a section of which was almost identical in language with the first section

of the act of the legislature of Pennsylvania under consideration.   The defendant was convicted by the Court of General Sessions of New York.   The conviction was affirmed by the General Term of the Supreme Court, and from that decision an appeal was taken to the Court of Appeals, where the judgment was reversed.   The court was of opinion that the object and effect of the act, notwithstanding its title, was, not to supplement existing provisions against fraud and deception by means of imitation of dairy butter, but to prohibit the manufacture and sale of any article which could be used as a substitute for it, however openly and fairly the character of the substitute might be avowed and published, to drive the substituted article from the market and protect those engaged in the manufacture of dairy products against the competition of cheaper substances capable of being applied to the same uses as articles of food.   At the trial, and on the argument of the appeal, the ground was taken that, if such were the case, the manufacture or sale of any oleaginous compound, however pure and wholesome, as an article of food, if it was designed to take the place of dairy butter, was by that act made a crime, and the court said: "The result of the argument is, that if, in the progress of science, a process is discovered of preparing beef tallow, lard, or any other oleaginous substance, and communicating to it a palatable flavor, so as to render it serviceable as a substitute for dairy butter, and equally nutritious and valuable, and the article can be produced at a comparatively small cost, which will place it within the reach of those who cannot afford to buy dairy butter, the ban of this statute is upon it.   Whoever engages in the business of manufacturing or selling the prohibited product is guilty of a crime; the industry must be suppressed; those who could make a livelihood by it are deprived of that privilege; the capital invested in the business must be sacrificed, and such of the people of the State as cannot afford to buy dairy butter must eat their bread unbuttered."   And after referring to the state constitution, which provides that no member of the State shall be disfranchised, or be deprived of any of the rights and privileges secured to any citizen thereof, unless by

the law of the land, or the judgment of his peers; and to the clause which declares that no person shall be deprived of life, liberty, or property without due process of law; and to the first section of the article of the Fourteenth Amendment of the Federal Constitution, the court said: "These constitutional safeguards have been so thoroughly discussed in recent cases that it would be superfluous to do more than refer to the conclusions which have been reached, bearing upon the question now under consideration. Among these, no proposition is now more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit." And, referring to various decisions as to the meaning of liberty, among which was one that the right to liberty embraces the right of man "to exercise his faculties and to follow a lawful vocation for the support of life," the court said: "Who will have the temerity to say that these constitutional principles are not violated by an enactment which absolutely prohibits an important branch of industry for the sole reason that it competes with another, and may reduce the price of an article of food for the human race? Measures of this kind are dangerous even to their promoters. If the argument of the respondent in support of the absolute power of the legislature to prohibit one branch of industry for the purpose of protecting another, with which it competes, can be sustained, why could not the oleomargarine manufacturers, should they obtain sufficient power to influence or control the legislative councils, prohibit the manufacture or sale of dairy products? Would arguments then be found wanting to demonstrate the invalidity under the Constitution of such an act? The principle is the same in both cases. The numbers engaged upon each side of the controversy cannot influence the question here. Equal rights to all are what are intended to be secured by the establishment of constitutional limits to legislative power, and impartial tribunals to enforce them."

The answer made to all this reasoning, and this decision, is, that the act of Pennsylvania was passed in the exercise of its police power; meaning by that term its power to provide

for the health of the people of the State. Undoubtedly, this power of a State extends to all regulations affecting not only the health, but the good order, morals, and safety of society; but a law does not necessarily fall under the class of police regulations, because it is passed under the pretence of such regulation, as in this case, by a false title, purporting to protect the health and prevent the adulteration of dairy products, and fraud in the sale thereof. It must have in its provisions some relation to the end to be accomplished. If that which is forbidden is not injurious to the health or morals of the people, if it does not disturb their peace or menace their safety, it derives no validity by calling it a police or health law. Whatever name it may receive, it is nothing less than an unwarranted interference with the rights and the liberties of the citizen. *In the matter of Jacobs*, the law passed was entitled "An act to improve the public health by prohibiting the manufacture of cigars and preparation of tobacco in any form in tenement houses in certain cases, and regulating the use of tenement houses in certain cases." It prohibited the manufacture of cigars or preparation of tobacco in any form on any floor or in any part of any floor in any tenement house, if such floor or part of such floor was occupied by any person as a home or residence for the purpose of living, sleeping, cooking, or doing any household work therein; and declared that every person who was guilty of a violation of the act, or of having caused another person to commit such violation, should be deemed guilty of a misdemeanor, and punished by a fine of not less than ten dollars or more than one hundred dollars, or by imprisonment for not less than ten days or more than six months, or by both such fine and imprisonment. The tenement house used had four floors and seven rooms on each floor, and each floor was occupied by one family, living independently of the others, and doing its cooking in one of the rooms thus occupied. Jacobs was engaged in one of his rooms in preparing tobacco and making cigars, but there was no smell of tobacco in any part of the house except in that room. For this violation of the act he was arrested. A writ of *habeas corpus* sued out in the court below for his discharge

was dismissed at the special term of the Supreme Court. On appeal to the General Term this order was reversed, and the case was taken to the Court of Appeals. There the claim was made that the legislature passed this act in the exercise of its police power; but the court said in answer: "Generally it is for the legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety; and while its measures are calculated, intended, convenient, and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property cannot be arbitrarily invaded, and the determination of the legislature is not final and conclusive. If it passes an act ostensibly for the public health and thereby destroys or takes away the property of a citizen, and interferes with his personal liberty, then it is for the courts to scrutinize the act and see whether it really relates to and is convenient and appropriate to promote the public health. It matters not that the legislature may, in the title to the act, or in its body, declare that it is intended for the improvement of the public health. Such a declaration does not conclude the courts, and they must yet determine the fact declared and enforce the supreme law." And the court concluded an extended consideration of the subject by declaring that, when a health law is challenged in the courts as unconstitutional, on the ground that it arbitrarily interferes with personal liberty and private property without due process of law, the court must be able to see that it has in fact some relation to the public health, that the public health is the end aimed at, and that it is appropriate and adapted to that end; and as it could not see that the law in question forbidding the cigarmaker from plying his trade in his own room in the tenement house, when allowed to follow it elsewhere, was designed to promote the public health, it pronounced the law unconstitutional and void. If the courts could not in such cases examine into the real character of the act, but must accept the declaration of the legislature as conclusive, the most valued rights of the citizen would be subject

to the arbitrary control of a temporary majority of such bodies, instead of being protected by the guarantees of the Constitution. In the recent prohibition cases from Kansas this court, after stating that it belonged to the legislative department to determine primarily what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety, added: "It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the State. There are of necessity limits beyond which legislation cannot rightfully go. . . . The courts are not bound by mere form, nor are they to be misled by mere pretences. They are at liberty — indeed, are under a solemn duty — to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Mugler* v. *Kansas*, 123 U. S. 623, 661.

In *Watertown* v. *Mayo*, the Supreme Court of Massachusetts, speaking of the police power of the State, said: "The law will not allow rights of property to be invaded under the guise of a police regulation for the preservation of the health, or protection against a threatened nuisance; and when it appears that such is not the real object and purpose of the regulation the courts will interfere to protect the rights of citizens." 109 Mass. 315, 319. It would seem that under the constitutions of the States no legislature should be permitted, under the pretence of a police regulation, to encroach upon any of the just rights of the citizen intended to be secured thereby. Be this as it may, certain it is that no State can, under any pretence or guise whatever, impair any such rights of the citizen which the fundamental law of the United States has declared shall neither be destroyed nor abridged. Were this not so, the protection which the Constitution designed to

secure would be lost, and the rights of the citizen would be subject to the control of the state legislatures, which would in such matters be practically omnipotent. What greater invasion of the rights of the citizen can be conceived, than to prohibit him from producing an article of food, conceded to be healthy and nutritious, out of designated substances, in themselves free from any deleterious ingredients? The prohibition extends to the manufacture of an article of food out of any oleaginous substances, or compounds of the same, not produced from milk or cream, to take the place of butter or cheese. There are many oleaginous substances in the vegetable as well as the animal world, besides milk and cream, but out of none of them shall any citizen of the United States within the limits of Pennsylvania be permitted to produce such an article of food for public consumption. Only out of pure milk or cream shall that article be made, notwithstanding the vast means for its production furnished by the vegetable as well as by the animal kingdom. The full force of the doctrine asserted will be apparent if the extent is considered to which it may be applied. The prohibition may be extended to the manufacture and sale of other articles of food, of articles of raiment and fuel, and even of objects of convenience. Indeed, there is no fabric or product, the texture or ingredients of which the legislature may not prescribe by inhibiting the manufacture and sale of all similar articles not composed of the same materials.

The answer to the second question is equally conclusive against the decision of the court. In prohibiting the sale of the article which had been manufactured by the defendant pursuant to the laws of the State, the legislature necessarily destroyed its mercantile value. If the article could not be used without injury to the health of the community, as would be the case perhaps if it had become diseased, its sale might not only be prohibited but the article itself might be destroyed. But that is not this case. Here the article was healthy and nutritious, in no respect injuriously affecting the health of any one. It was manufactured pursuant to the laws of the State. I do not, therefore, think the State could forbid

its sale or use ; clearly not without compensation to the owner. Regulations of its sale and restraints against its improper use undoubtedly could be made, as they may be made with respect to all kinds of property; but the prohibition of its use and sale is nothing less than confiscation. As I said in *Bartemeyer* v. *Iowa*, 18 Wall. 129, 137, with reference to intoxicating liquors, so I say with reference to this property, I have no doubt of the power of the State to regulate its sale, when such regulation does not amount to the destruction of the right of property in it. " The right of property in an article involves the right to sell and dispose of such article as well as to use and enjoy it. Any act which declares that the owner shall neither sell it nor dispose of it, nor use and enjoy it, confiscates it, depriving him of his property without due process of law. Against such arbitrary legislation by any State the Fourteenth Amendment affords protection. But the prohibition of sale in any way or for any use is quite a different thing from a regulation of the sale or use so as to protect the health and morals of the community." The fault which I find with the opinion of the court on this head is that it ignores the distinction between regulation and prohibition.

---

WALKER v. PENNSYLVANIA, No. 1303. Error to the Supreme Court of the State of Pennsylvania. Argued January 4, 1888. Decided April 9, 1888. MR. JUSTICE HARLAN delivered the opinion of the court. The questions presented in this case do not differ, in any material respect, from those determined in POWELL v. PENNSYLVANIA, just decided. The principles announced in that case necessarily require an affirmance of the judgment below.

*Affirmed.*

MR. JUSTICE FIELD dissented.

*Mr. D. T. Watson* and *Mr. W. B. Rodgers* for plaintiffs in error.

*Mr. Wayne McVeagh* for defendant in error.