[No. 15581. Department Two. January 29, 1920.]

FISHER FLOURING MILLS COMPANY et al., Respondents, v. FRED C. BROWN, Prosecuting Attorney of King County, et al., Appellants.[1]

STATUTES (14)—SUBJECTS AND TITLES. The title to Laws 1919, p. 248, et seq., referring to the "adulteration" of concentrated commercial feeding stuffs sufficiently expresses the subject-matter of § 3 (as required by Const., art. 2, § 19), which limits to ten per cent the amount of crude fiber in the feeds enumerated; since "adulteration" in the title applies to the addition of weaker or less nutritious substances and not merely to foreign substances.

CONSTITUTIONAL LAW (48, 116, 134) — REGULATION OF TRADE OR BUSINESS—POLICE POWERS—EQUAL PROTECTION OF THE LAWS—DUE PROCESS. The state and Federal constitutional guarantees of due process and equal protection of the laws do not apply to laws enacted by the state legislature in the exercise of its police powers; hence Laws 1919, p. 248 et seq., relating to the adulteration of concentrated feeding stuffs, enacted for the protection of dairymen and stockmen, does not violate Const., art. 1, §§ 3 and 12, or the 14th amendment to the Federal constitution; notwithstanding that some innocuous feed stuffs are incidentally included within the prohibition of the law.

Appeal from an order of the superior court for King county, Gilliam, J., entered August 15, 1919, granting a temporary injunction restraining the defendants

[1] Reported in 187 Pac. 399.

from enforcing certain provisions of the concentrated commercial feeding stuffs act, after a hearing before the court.  Reversed.

*The Attorney General, Glenn J. Fairbrook, Assistant, Fred C. Brown,* and *Howard A. Hanson (Chas. S. Gleason, E. L. Skeel,* and *Earl G. Rice,* of counsel), for appellants.

*Donworth, Todd & Higgins (Hyman Zettler,* of counsel), for respondents.

MITCHELL, J. — This is an appeal from an order granting a temporary injunction restraining the defendants from enforcing so much of the concentrated commercial feeding stuffs act, enacted by the legislature of 1919, as purports to limit to ten per cent the amount of crude fibre which the feeds enumerated in § 1 of the act may lawfully contain.  The act in question is ch. 101, page 248 *et seq.,* Laws of 1919.  The sections thereof material to this case are 1, 2, 3, 4, 6 and 10, and are as follows:

"Section 1.  The term 'concentrated commercial feeding stuffs' as used in this act shall include linseed meals, cocoanut meats, gluten feeds, sugar feeds, dried brewer's or distiller's grains, malt sprouts, feeds made from ground cereals or by-products therefrom, including slaughter-house waste products when sold as feeds, mixed feeds, and mixed meals made from seeds or grains, and all materials of similar nature used for food for domestic animals, condimental feeds, stock feeds, and all patented proprietary or trade stock and poultry feeds for which nutritive value is claimed, but it shall not include hay or whole seeds, or unmixed meals made from entire grains of wheat, rye, barley, oats, corn, or other cereals, nor wheat flour or other flours.

"Sec. 2.  Before any concentrated commercial feeding stuff is sold, offered or exposed for sale in Washington, the manufacturer, importer, dealer, agent, or

person who causes it to be sold or offered for sale, by sample or otherwise, within this state, shall file with the Commissioner of Agriculture a statement that he desires to offer such concentrated commercial feeding stuff for sale in this state, and also a certificate, the execution of which shall be sworn to before a notary public, or other proper official, for registration, stating the name, brand or trade-mark under which the concentrated commercial feeding stuff will be sold, and the minimum percentage of crude fat and crude protein and maximum per cent of crude fibre (allowing 1 per centum nitrogen to equal 6.25 per centum of protein) which the manufacturer or person offering the concentrated commercial feeding stuff for sale guarantees it to contain, these constituents to be determined by the methods recommended by the association of official agricultural chemists of the United States.

"Sec. 3. Any person, company, corporation or agent, that shall sell, offer or expose for sale, any concentrated commercial feeding stuff in this state shall state in the invoice of every bulk shipment, shall affix or cause to be affixed to every package or sample of such concentrated commercial feeding stuff, in a conspicuous place on the outside thereof, a tag or label, which shall be accepted as a guarantee of the manufacturer, importer, dealer, or agent, and which shall have plainly printed thereon, in the English language, the number of net pounds of concentrated commercial feeding stuff in the package or bulk shipment, the name, brand or trade-mark under which the concentrated commercial feeding stuff is sold, the name and address of the manufacturer, importer, dealer or agent, the guaranteed analysis stating the minimum percentage of crude fat and crude protein and maximum per cent of crude fibre, which shall not exceed ten per cent (10%), determined as described in section 2, and the ingredients from which the concentrated commercial feeding stuff is compounded. The agency distributing to users of such feed in less than carload lots shall deliver to the purchaser of each lot regardless of quantity sold a bill showing current analysis of such feeding stuffs.

"Sec. 4. Any person, company, corporation, or agent, that shall offer or expose for sale, or sell, any package or sample or any quantity of any concentrated commercial feeding stuff which has not been registered with the Commissioner of Agriculture, as required by section 2, or which does not have affixed to it the tag or label required by section 3, or which is found by analysis made by or under the direction of the chemist of Washington Agricultural Experiment Station to contain a smaller percentage of crude fat or protein or larger percentage of crude fibre than stated in the guarantee, or who shall affix a tag or label which is false or inaccurate in any respect, or who shall adulterate any concentrated commercial feeding stuff, or who shall adulterate with any substance injurious to the health of domestic animals, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in the sum of one hundred dollars ($100.00) for the first offense, and in the sum of five hundred dollars ($500.00) for each subsequent offense. In all litigation arising from the purchase or sale of any concentrated commercial feeding stuff, in which the composition of the same may be involved, a certified copy of the official analysis, signed by the chemist of the Washington Agricultural Experiment Station, shall be accepted as *prima facie* evidence of the composition of such concentrated commercial feeding stuff: *Provided,* That nothing in this act shall be construed to restrict or prohibit the sale of concentrated commercial feeding stuff in bulk to each other by importers, manufacturers, or manipulators who mix concentrated commercial feeding stuffs for sale, or as preventing the unrestricted shipment of these articles in bulk to manufacturers or manipulators of concentrated commercial feeding stuffs for sale, or to prevent the State Experiment Station, or any person or persons authorized by the State Experiment Station, from making experiments with concentrated commercial feeding stuffs for the advancement of science in agriculture.

"Sec. 6. It shall be unlawful to include in any concentrated commercial feeding stuff, any buckwheat hulls, rice hulls, cottonseed hulls, peanut hulls, oat

hulls, peanut shells, corn cobs, cocoanut shells, ground or shredded straw, sawdust, cellulose, dirt, damaged or decayed feed, mill, elevator or other sweepings or dust, marble dust, or any injurious, deleterious, or, for feeding purposes, worthless or damaged ingredient.

"Sec. 10. It shall be the duty of the state attorney general or the prosecuting attorneys of the several counties of this state, to cause proceedings to be commenced against any person or persons whom the Commissioner of Agriculture shall report to have violated any section of this act, and to prosecute the same in the manner required by law."

Other sections make general provisions for the enforcement of the act, including such rules and regulations as the commissioner of agriculture may deem necessary.

The complaint alleges that plaintiffs are, and for years have been, engaged in the manufacture in this state of certain named concentrated commercial feeding stuffs, which contain over ten per cent crude fibre, in which they do an extensive business, and that such feeding stuffs are wholesome and beneficial for domestic animals and are in general use by feeders throughout the state; that the limiting of the crude fibre content to ten per cent is arbitrary and in violation of all custom and precedent, and no other law has ever been enacted in any state or country restricting the crude fibre content in such feeds to any percentage at all approaching ten; that, in this state, there are numerous mills manufacturing breakfast and cereal foods for human consumption, such as oatmeal, rolled oats, and other preparations of oats, wheat and barley, and many flouring mills, all of which manufactories and mills produce large quantities of oat by-products, wheat bran, wheat mill feed, barley shorts and screenings, and other by-products that are of great value for animal feed; and for years, here and

throughout the United States, all such by-products have been used for animal feed by combining them with other wholesome feed substances; that to prohibit such combinations on account of feeds containing an excess of ten per cent of crude fibre is arbitrary and unreasonable and would result in the total loss and waste of such by-products; that the enforcement of said clause limiting the fibre content of such feeds would deprive plaintiffs of the right guaranteed by the constitution of the United States to engage in lawful and ordinary business, would seriously impair and destroy the established business of each of the plaintiffs, would prevent each plaintiff from making lawful contracts for the sale of wholesome feeds, and would discriminate unlawfully between feeds now manufactured by them and other feeds containing ten per cent or less of crude fibre, on a purely arbitrary basis; that the ten per cent crude fibre clause is unconstitutional because not covered by or included within the title to the act; and that in all other respects the act is valid and commendable. Against the proposed enforcement by defendants of the ten per cent clause as to crude fibre, an injunction is prayed for, as well as a judgment that the clause be declared invalid.

As it already appears, the provision or language objected to is, "which shall not exceed ten per cent (10%)," immediately following the words "maximum per cent of crude fibre," in § 3 of the act. The provision of the state constitution claimed to be violated is § 19, art. 2, as follows:

"No bill shall embrace more than one subject, and that shall be expressed in the title."

The act is designated or named "Concentrated Commercial Feeding Stuffs," and is more specifically entitled as follows:

"An act to provide for registration and guarantee of composition of concentrated commercial feeding stuffs, providing against the adulteration of such feeding stuffs, declaring violation of its provisions to be a misdemeanor and providing a penalty therefor, and requiring the attorney general and prosecuting attorneys to prosecute violations thereof."

No aid to the clause in question is to be found in the latter part of the specific title, beginning with the words, "declaring violation." So that the question of the sufficiency of the title to cover the language objected to must be answered by those words of the title as follows:

"An act to provide for registration and guarantee of composition of concentrated commercial feeding stuffs, providing against the adulteration of such feeding stuffs, . . ."

There is a wealth of authority and manner of expression in this state and elsewhere in defining the purpose and application of this or similar constitutional provisions. In the early case of *Lancey v. King County*, 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817, referring to the provision in question, this court said:

"It is well settled, however, by the weight of authority, that an act of the legislature will not be declared void except in cases where the violation of this constitutional inhibition is most clear, and sound policy and legislative convenience require that this provision should be liberally construed."

As late as the case of *Holzman v. Spokane*, 91 Wash. 418, 157 Pac. 1086, this court said:

"This court has always liberally construed the constitutional requirement that the subject-matter of an act of the legislature shall be expressed in its title, and has deferred to legislative discretion touching that requirement, except in cases of its plainest violation. The doctrine that all reasonable doubts as to the con-

stitutionality of an act of the legislature should be
resolved in favor of upholding the act has peculiar
force in the solution of the question of whether or not
the act has been in form constitutionally passed, be-
cause such a constitutional question has to do with
legislative procedure. In other words, it has to do
with the methods of transacting public business by a
co-ordinate branch of the state government, and not
with those constitutional guaranties of personal rights
which it is the peculiar province of the courts to
protect.''

It may be admitted that the provision for the regis-
tration and guarantee of composition affords of itself
no foundation for including in the act the clause ob-
jected to; but the title goes further and expresses the
purpose to provide ''against adulteration of such feed-
ing stuffs,'' not necessarily mixing in some foreign
substance that is *per se* obnoxious or an adulterant,
but the adding to the more valuable portion of the
feeding stuffs of any weaker or less nutritious sub-
stance, such as crude fibre, although derived, among
other ways, as a by-product in the manufacture of food
for human beings out of the same kind of grain or
grains as that constituting the most valuable portion
of the feeding stuffs. Unquestionably the different
kinds of feeding stuffs, in their natural state, contain
crude fibre in varying degrees, and it is to be noticed
that, by the concluding words in § 1 of the act, it is
provided that the term ''concentrated commercial feed-
ing stuffs'' ''shall not include hay or whole seeds, or
unmixed meals made from entire grains of wheat, rye,
barley, oats, corn, or other cereals, nor wheat flour or
other flours.''

Section 1 of the act enumerates what are included
in the term ''concentrated commercial feeding stuffs,''
and, among others, mentions ''mixed feeds, and mixed
meals made from seeds or grains, and all materials

of similar nature used for food for domestic animals, condimental feeds, stock feeds, and all patented proprietary or trade stock and poultry feeds for which nutritive value is claimed,'' which evidently are capable of being adulterated. To the ordinary mind, and possibly to the critical mind, the word ''adulterate'' means to reduce in quality, to weaken, to make less valuable. Mr. Webster defines it: ''To corrupt, debase, or make impure by an admixture of a foreign or a baser substance.''

In the case of *St. Louis v. Jud,* 236 Mo. 1, 139 S. W. 441, cited by respondent, in defining the word and giving Webster's definition, the court says:

''That standard work illustrates the application of the word. It states that articles are adulterated 'to improve or change their appearance or flavor in imitation of an article of higher grade or of a different kind.' Adulteration is a 'treatment to simulate a better article'; an 'artificial concealment of defects.' ''

Indeed, in this state, we are not without a statutory definition, as applied to foods, to practically the same effect. In 1899 (session laws, page 183), in an act to provide against the adulteration of food, it is declared that an article should be deemed adulterated if, among other things, ''any valuable or necessary constituent or ingredient has been wholly or in part abstracted from it.'' In 1901 (session laws, page 195), upon the same subject, it was provided that an article should be deemed adulterated if, among other things, ''any valuable constituent of the article has been wholly or in part abstracted so that the product when sold shall deceive or tend to deceive the purchaser.'' And again, in 1907 (session laws, page 479), extending the law to include food for animals as well as persons, it was declared that food should be deemed adulterated if, among other things, ''any valuable constituent of the

article has been wholly or in part abstracted." (Rem.
Code, § 5455.)

Since the evident purpose of the present act is to
protect the consumer from what the legislature con-
siders inferior articles of concentrated commercial
feeding stuffs, it is difficult to understand why a pro-
hibition against importing into the feeding stuffs. the
baser constituent elements of other similar natural
feeds is not germane to the words in the title of the
act against adulteration, since we find that, by legis-
lative enactments, although in other acts upon the sub-
ject of the adulteration of foods, the process of ab-
stracting in whole or in part the valuable contents of
natural foods is declared to constitute adulteration.
Just now we are not dealing with the matter of the
preciseness of the limit of ten per cent of crude fibre,
but only the question of whether or not the inclusion
of any expression on that subject is permissible under
the title of the act and the limitation provided in the
state constitution.

Eliminating the name "Concentrated Commercial
Feeding Stuffs" given to the act by the legislature,
and looking only to the language of the title specifically
defining the subject of the act, counsel for respondents
invoke the familiar rule stated in the case of *Percival
v. Cowychee & Wide Hollow Irr. Dist.*, 15 Wash. 480,
46 Pac. 1035, as follows:

"A title may be as broad as the legislature sees fit
to make it, and thereunder any specific legislation, as
to any subject relating to the general matter thus
broadly embraced in the title, sustained. But when it
sees fit to adopt a restricted title and thereunder at-
tempts to enact provisions not fairly within such re-
stricted title, such provisions cannot be given force by
reason of the fact that it would have been competent
for the legislature to have adopted a more generic

title and thereunder properly included all of the provisions of the act."

Supporting the same rule, counsel cite: *Sengfelder v. Hill,* 21 Wash. 371, 58 Pac. 250; *Armour & Co. v. Western Const. Co.,* 36 Wash. 529, 78 Pac. 1106; *State ex rel. Nettleton v. Case,* 39 Wash. 177, 81 Pac. 554, 109 Am. St. 874, 1 L. R. A. (N. S.) 152; *State v. Merchant,* 48 Wash. 69, 92 Pac. 890; *Bradley Eng. & Mach. Co. v. Muzzy,* 54 Wash. 227, 103 Pac. 37; *State ex rel. Arnold v. Mitchell,* 55 Wash. 513, 104 Pac. 791, together with other similar cases from this and other jurisdictions.

' There is no quarrel with that line of cases. They are strictly according to the constitutional provision in question. It will be found that, in each of those cases, there was involved some subject dealt with in the act which the court decided was not taken care of in the wording of the title to the act, just as is claimed here. To illustrate, in the case of *Percival v. Cowychee & Wide Hollow Irr. Dist., supra,* the title of the act was "An act providing for the organization and government of irrigating districts and the sale of bonds arising therefrom, and declaring an emergency." It was held that the title was not broad enough to embrace a provision in the act for validating indebtedness of a previously organized district and levying a tax to pay the same. It was a case in which the act embraced matter in addition to, or, rather, not germane to, anything expressed in the title. That is the rule. Here, however, there is a title which, within the restricted portion to which we have confined ourselves, enumerates three purposes concerning the subject of concentrated commercial feeding stuffs, namely: (1) registration of the composition; (2) guarantee of the composition; and (3) providing against the adulteration of feeding stuffs; and under the settled rule

of liberality of construction of this provision of the state constitution, and the reasons given for that rule, we are of the opinion that the clause limiting the crude fibre content to ten per cent is germane to, and covered by, the latter, or third, purpose of providing against adulteration.

This conclusion is fortified by another consideration. Counsel for respondents admit the outlawed articles mentioned in § 6 of the act are properly proscribed and that such provision is well within the title of the act. If so, it is because § 6 is taken care of by those words of the title providing against adulteration; and it would appear that any other provision, such as the ten per cent fibre clause, manifestly intended, at least presumably intended and well calculated to aid in an effective enforcement of the prohibited use of the articles mentioned in § 6 of the act, is of itself provided for in the title of the act. Both are meant to provide against adulteration, the one not beyond ten per cent fibre, and the other not to be used at all. True, in the complaint it is alleged respondents favor, and do not propose to violate, the terms of § 6 of the act; but that is not the test, for the controversy here is over another provision which may of itself, or in conjunction with the terms of § 6, prevent all persons within the state, or to come into the state, whether they be respondents or others, from handling concentrated commercial feeding stuffs that contain more than ten per cent crude fibre.

It is further argued that the enforcement of the ten per cent fibre clause of the act, under the circumstances in which the respondents are situated, would violate § 3, art. 1, of the state constitution, which provides that no person shall be deprived of life, liberty, or property without due process of law; and also § 12 of the same article which guarantees equal protection to

all citizens; and also § 1 of the fourteenth amendment to the Federal constitution extending the same protection as those portions of the state constitution just above referred to.

It is well understood that those provisions of the constitutions do not apply to laws enacted by a state legislature in the exercise of its police power. *Powell v. Pennsylvania,* 127 U. S. 678.

In the case of *State v. Pitney,* 79 Wash. 608, 140 Pac. 918, Ann. Cas. 1916A 209, the police power of a state is declared

"to include all those regulations designed to promote the public convenience, the general welfare, the general prosperity, and extends to all great public needs, as well as regulations designed to promote the public health, the public morals, or the public safety."

And marking the way for our present pursuit, citing and quoting from the cases of *Munn v. Illinois,* 94 U. S. 113, and *Home Telephone & Telegraph Co. v. Los Angeles,* 211 U. S. 265, it was further said in the *Pitney* case:

"In determining whether the provisions of a law bring it within the police power, it is not necessary for the court to find that facts exist which would justify such legislation. If a state of facts can reasonably be presumed to exist which would justify the legislation, the court must presume that it did exist and that the law was passed for that reason. If no state of circumstances could exist to justify the statute, then it may be declared void because in excess of the legislative power."

Manifestly, the object of the legislature in protecting the vast and increasing number of users of concentrated commercial feeding stuffs in this state against the adulteration of the articles is within the police power; and in exerting this authority it is at liberty to adopt such measures, having reasonable re-

lation to that end, as it may deem necessary to make its action effective. Upon this subject, in the case of *Purity Extract & Tonic Co. v. Lynch,* 226 U. S. 192, it was said:

"With the wisdom of the exercise of that judgment the court has no concern; and unless it clearly appears that the enactment has no substantial relation to a proper purpose, it cannot be said that the limit of legislative power has been transcended. To hold otherwise would be to substitute judicial opinion of expediency for the will of the legislature,—a notion foreign to our constitutional system."

A careful examination of the case of *Powell v. Pennsylvania, supra,* later approved in *Hammond Packing Co. v. Montana,* 233 U. S. 331, will discover sufficient reasons for, and the highest authority to sustain, the provision of the act of 1919 now in controversy as affected by those provisions of the state and Federal constitution referred to. That case involved the right of the state to forbid the sale of oleomargarine manufactured in the state. The defendant was charged with the violation of an act entitled: "An act for the protection of dairymen, and to prevent deception in sales of butter and cheese," in that he sold what in effect was oleomargarine, being an imitation of butter. The defendant offered to prove that the article he sold was pure and wholesome, that the process of its manufacture was clean, and that the article contained the same elements as dairy butter, the only difference being that the manufactured article he sold contained a slightly smaller percentage of fatty substance known as butterine; that, in connection with his business in the sale of the article, he had made large investments in real estate, buildings and necessary machinery and ingredients; that he made large profits in his traffic in the article, and if prevented from continuing in it the

value of his property would be lost and he would be deprived of the means of a livelihood. The court said the purpose of his proof was avowed to show, *inter alia,* that the article was not an adulteration of dairy products, nor injurious to the public health, but wholesome and nutritious, and that its manufacture and sale were in conformity to certain laws of the state; and also to show that the statute upon which the action was founded was unconstitutional and not a lawful exercise of the police power, and also because it deprived the defendant of the lawful use of his property, liberty and faculties and destroyed his property without making compensation. The trial court sustained an objection to the offered testimony as being immaterial and irrelevant. The supreme court sustained the ruling. The main argument against the law was that it violated § 1 of the fourteenth amendment to the Federal constitution. In speaking upon the merits of the case, the court said:

"It will be observed that the offer in the court below was to show by proof that the particular articles the defendant sold, and those in his possession for sale, in violation of the statute, were, in fact, wholesome or nutritious articles of food. It is entirely consistent with that offer that many, indeed, that most kinds of oleomargarine butter in the market contain ingredients that are or may become injurious to health. The court cannot say, from anything of which it may take judicial cognizance, that such is not the fact. Under the circumstances disclosed in the record, and in obedience to settled rules of constitutional construction, it must be assumed that such is the fact. 'Every possible presumption,' Chief Justice Waite said, speaking for the court in *Sinking Fund Cases,* 99 U. S. 700, 718, 'is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict ob-

servance of this salutary rule.' See, also, *Fletcher v. Peck*, 6 Cranch, 87, 128; *Dartmouth College v. Woodward*, 4 Wheat. 518, 625; *Livingston v. Darlington*, 101 U. S. 407.

"Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts. It is not a part of their functions to conduct investigations of facts entering into questions of public policy merely, and to sustain or frustrate the legislative will, embodied in statutes, as they may happen to approve or disapprove its determination of such questions. The power which the legislature has to promote the general welfare is very great, and the discretion which that department of the government has, in the employment of means to that end, is very large. While both its power and its discretion must be so exercised as not to impair the fundamental rights of life, liberty, and property; and while, according to the principles upon which our institutions rest, 'the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself;' yet, 'in many cases of mere administration, the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of public opinion or

by means of the suffrage.' *Yick Wo v. Hopkins,* 118 U. S. 370. The case before us belongs to the latter class. The legislature of Pennsylvania, upon the fullest investigation, as we must conclusively presume, and upon reasonable grounds, as must be assumed from the record, has determined that the prohibition of the sale, or offering for sale, or having in possession to sell, for purposes of food, of any article manufactured out of oleaginous substances or compounds other than those produced from unadulterated milk or cream from unadulterated milk, to take the place of butter produced from unadulterated milk or cream from unadulterated milk, will promote the public health, and prevent frauds in the sale of such articles. If all that can be said of this legislation is that it is unwise, or unnecessarily oppressive to those manufacturing · or selling wholesome oleomargarine, as. an article of food, their appeal must be to the legislature, or to the ballot-box, not to the judiciary. The latter cannot interfere without usurping powers committed to another department of government.''

True, later, in the case of *Schollenberger v. Pennsylvania,* 171 U. S. 1, relied on by respondents, the court held, after it was shown that oleomargarine contained no substance injurious to health, that it was a lawful article of interstate commerce; as, also, in the case of *Collins v. New Hampshire,* 171 U., S. 30, a state law requiring oleomargarine to be colored pink to entitle it to be sold, was held to be invalid. But still later, in the case of *Hammond Packing Co. v. Montana, supra,* the supreme court dismissed the contention of plaintiff in error, who therein relied on the *Schollenberger* and *Collins* cases, that the state could not prohibit the manufacture and sale of oleomargarine, with the terse statement:

''Apart from interference with commerce among the States, a State may restrict the manufacture of oleomargarine in a way in which it does not hamper that

of butter. *Capital City Dairy Co. v. Ohio,* 183 U. S. 238, 245, 246. It even may forbid the manufacture altogether, *Powell v. Pennsylvania,* 127 U. S. 678.''

And, again, the supreme court of the United States has reaffirmed the same doctrine. The state of Ohio had a statute prohibiting the sale of condensed milk unless it was made from unadulterated milk from which the cream had not been removed, and in which the milk solids should equal twelve per cent of milk solids in crude milk, twenty-five per cent of such solids being fat, and requiring the package to be labeled with its true name, etc. The court, in the case of *Hebe Co. v. Shaw,* 248 U. S. 297, in holding that the sale of an article called ''Hebe,'' conceded to be wholesome, but made in part from skimmed, rather than unadulterated milk, was prohibited by the act, said:

''We are satisfied that the statute as construed by us is not invalidated by the Fourteenth Amendment. The purposes to secure a certain minimum of nutritive elements and to prevent fraud may be carried out in this way even though condensed skimmed milk and Hebe both should be admitted to be wholesome. The power of the legislature 'is not to be denied simply because some innocent articles or transactions may be found within the proscribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat.' *Purity Extract & Tonic Co. v. Lynch,* 226 U. S. 192, 204. If the character or effect of the article as intended to be used 'be debatable, the legislature is entitled to its own judgment, and that judgment is not to be superseded by the verdict of a jury,' or, we may add, by the personal opinion of judges, 'upon the issue which the legislature has decided. *Price v. Illinois,* 238 U. S. 446, 452; *Rast v. Van Deman & Lewis Co.,* 240 U. S. 342, 357, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455. The answer to the inquiry is that the provisions are of a kind familiar to legislation and often sustained and that it is impossible for

this court to say that they might not be believed to be necessary in order to accomplish the desired ends.''

Admitting that certain concentrated commercial feeding stuffs, as now manufactured by respondents, containing crude fibre in excess of ten per cent, separately considered, are innocuous, it does not necessarily follow they may not be incidentally included in a prohibition the scope of which is regarded by the law-making power as essential to accomplish a purpose within the power of the legislature. *Purity Extract & Tonic Co. v. Lynch, supra.*

Concerning the maximum allowed of ten per cent fibre, it is obvious upon the face of the provision that the legislature considered and determined the matter according to its judgment; and for us to hold that, in doing so, it transcended its reserved powers, would constitute an unwarranted departure from well understood principles.

We are of the opinion the words complained of are a valid provision of the law; from which it follows that the order granting a temporary injunction must be, and it is, reversed.

HOLCOMB, C. J., PARKER, MACKINTOSH, and MAIN, JJ., concur.