## HELENA *v.* DWYER.

### Opinion delivered November 13, 1897.

MUNICIPAL ORDINANCE—PROHIBITING SALE OF PORK.—A municipal ordinance prohibiting the sale of fresh pork between the months of June and October is not a valid exercise of the power granted to cities of the first class (by Sand. & H. Dig., § 5313) to prevent or regulate the carrying on of any trade, business or vocation of a tendency dangerous to health. (Page 425.)

Appeal from Phillips Circuit Court.

HANCE N. HUTTON, Judge.

*R. W. Nichols*, for appellant.

The determination of the council that anything is detrimental to public health is conclusive, unless it vitiates express statute or constitutional law. 1 Dillon, Mun. Corp. § 144, and cases cited. The town council had power to pass the ordinance in question, because it is a sanitary regulation. 1 Gill, 264; 11 S. E. 545; S. C. 8 L. R. A. 854; 94 U. S. 147; 67 Ill. 37; 33 Cal. 279; 19 Ga. 323; 85 U. S. 138. The ordinance is not a restraint on trade, but a lawful regulation of it. The council is given power by statute to pass such laws. Sand. & H. Dig., §§ 5132, 5146, 5313.

*Tappan & Porter*, for appellees.

The board of health had no authority to declare the sale of pork detrimental to the citizens of Helena. Sand & H. Dig., § 5203. The ordinance is a restraint on trade, and is void. Dillon, Mun. Law, §§ 253, 256 and 257 (2 Ed.); 85 Am. Dec. 285. The burden of proof is on the municipality to sustain its authority to enact the ordinance. 72 Am. Dec. 94,

96; 69 Am. Dec. 588; 34 Am. Dec. 627, and notes; 51 Am. Dec. 465.

BATTLE, J. The city council of Helena enacted the following ordinance:

"Whereas, the municipal board of health of Helena, Arkansas, at a regular meeting, held on the 30th day of April, 1880, declared the sale of fresh pork detrimental to the health of the citizens of Helena; therefore, be it ordained by the mayor and council of the city of Helena:

"Section 1. That it shall not be lawful for any person or persons to sell, or offer to sell, within the city any fresh pork, or sausage made thereof, between the first · day of June and October in each year.

"Section 2. That any person or persons violating this ordinance shall be fined in a sum not less than five dollars nor more than twenty-five dollars," etc.

Is the ordinance valid? In determining the extent of the power of a city council to pass ordinances for the protection of the public health, much assistance can be derived from what has been held to be the limitations upon such power of the state, for it cannot be truthfully said that the state can grant to a municipal corporation greater power than it possesses.

The police power of the state is very broad and comprehensive, and can be exercised to promote the health, comfort, safety and welfare of society. Its limits have not been definitely defined. It is not, however, without its limitations. In *Re Jacobs*, 98 N. Y. 110, the court said: "If this were otherwise, the power of the legislature would be practically without limitation. In the assumed exercise of the police power in the interest of the health, the welfare or the safety of the public, every right of the citizen might be invaded, and every constitutional barrier swept away. Generally, it is for the legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended, convenient and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police

regulations, personal rights and private property cannot be arbitrarily invaded, and the determination of the legislature is not final or conclusive. If it passes an act ostensibly for the public health, and thereby destroys or takes away the property of a citizen, or interferes with his personal liberty, then it is for the courts to scrutinize the act, and see whether it relates to and is convenient and appropriate to promote the public health. It matters not that the legislature may in the title to the act, or in its body, declare that it is intended for the improvement of the public health. Such a declaration does not conclude the courts, and they must yet determine -the fact declared and enforce the supreme law."

In *Mugler* v. *Kansas*, 123 U. S. 661, the court said: "The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals or the public safety, *has no real or substantial relations to those objects*, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution." To the same effect other courts have held. *Watertown* v. *Mayo*, 109 Mass. 315; *Powell* v. *Pennsylvania*, 127 U. S. 686.

The constitution of the state declares that "all men are created free and independent, and have certain inherent and inalienable rights, amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." (Art. 2, § 2.) In *Powell* v. *Pennsylvania*, 127 U. S. 692, Mr. Justice Field said: "With the gift of life there necessarily goes to every one the right to do all such acts, and follow all such pursuits, not inconsistent with the equal rights of others, as may support life and add to the happiness of its possessor. The right to pursue one's happiness is placed by the Declaration of Independence among the inalienable rights of man, with which all men are endowed, not by the grace of emperors or kings, or by force of legislative or constitutional enactments,

but by their Creator; and to secure them, not to grant them, governments are instituted among men. The right to procure healthy and nutritious food, by which life may be preserved and enjoyed, and to manufacture it, is among these inalienable rights, which, in my judgment, no state can give and no state can take away except in punishment for crime. It is involved in the right to pursue one's happiness."

In *The People* v. *Marx*, 99 N. Y. 386, the court, in speaking of the section of the constitution which declares that "no state shall deprive any person of life, liberty or property, without due process of law," said: "These constitutional safeguards have been so thoroughly discussed in recent cases that it would be superfluous to do more than refer to the conclusions which have been reached, bearing upon the question now under consideration. Among these no proposition is now more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful industrial pursuit, *not injurious to the community*, as he may see fit. * * * The term 'liberty,' as protected by the constitution, is not cramped into a mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of man to be free in the employment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the *common welfare*. In the language of Andrews J., in *Bertholf* v. *O'Reilly* (74 N. Y. 515), the right to liberty embraces the right of man 'to exercise his faculties and to follow a lawful avocation for the support of life.'" Upon this doctrine the court held that the provision of an act "prohibiting the manufacture or sale, as an article of food, of any substitute for butter or cheese produced from pure, unadulterated milk or cream is unconstitutional, inasmuch as the prohibition is not limited to unwholesome or simulated substitutes, but absolutely prohibits the manufacture or sale of any compound designed to be used as a substitute for butter or cheese, however wholesome, valuable or cheap it may be, and however openly and fairly the character of the substitute may be avowed and published."

In *Powell* v. *Pennsylvania*, 127 U. S. 678, a statute of the

state of Pennsylvania was involved. It provided: "No person, firm, or corporate body shall manufacture out of any oleaginous substance, or any compound of the same, other than that produced from unadulterated milk or cream from the same, any article designed to take the place of butter or cheese produced from pure, unadulterated milk or cream from the same, or of any imitation or adulterated butter or cheese, nor shall sell or offer for sale, or have in his, her, or their possession, with intent to sell the same, as an article of food." The court, sustaining the statute, said: "It (the court) cannot adjudge that the defendant's rights of liberty and property  *  *  *  have been infringed by the statute of Pennsylvania, without holding that, although it may have been enacted in good faith for the objects expressed in its title, namely, to protect the public health and to prevent the adulteration of dairy products and fraud in the sale thereof, it has, in fact, no real or substantial relation to those objects. *Mugler* v. *Kansas*, 123 U. S. 623, 661. The court is unable to affirm that this legislation has no real or substantial relation to such objects.  *  *  *  Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy, which belong to the legislative department to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts."

But, fortunately, the ordinances of municipal corporations are not protected by conclusive presumptions in favor of their validity, as the statute was in *Powell* v. *Pennsylvania*. The city council is not the sole judge of their necessity, propriety, or reasonableness. Courts may inquire into their reasonableness when passed under powers granted in general or indefinite

terms, and, when found unreasonable, may set them aside. *Haynes* v. *Cape May*, 50 N. J. L. 55. Such corporations have none of the elements of sovereignty, and must exercise their powers in a reasonable manner; and, when necessary, evidence may he adduced to show that they are unreasonable or oppressive. *Corrigan* v. *Gage*, 68 Mo. 541.

The statutes of this state confer upon cities of the first class powers "to prevent or regulate the carrying on of any trade, business or vocation of a tendency dangerous to morals, health or safety, or calculated to promote dishonesty or crime." Sand. & H. Dig., § 5313. Under this statute the city council of Helena undertook to prevent the sale of fresh pork "between the first day of June and October in each year." It obviously intended to prevent the eating of it in Helena during this time by prohibiting the sale of it. Was the ordinance passed for that purpose a reasonable or lawful exercise of the powers granted by the statute?

Fresh pork is an article of food of general consumption, and, when sound and free from disease, is useful and nutritious. Like all other food, it may become unwholesome when eaten to excess. The quantity eaten, under ordinary circumstances, produces the sickness, when it proves unwholesome. Any food is calculated to produce that effect when eaten in the same manner. The mere sale of it is not detrimental to the public health. The fact that individuals may be made sick by it, when imprudently eaten, does not justify a city council in prohibiting the sale of it. For the same reason it could prohibit the sale of any or all other food. The most delicious food, that which is most liable to be eaten to excess, would be subject to interdiction. If it be conceded that the city council may prohibit the sale of any article of food, the wrongful use of which will or may injure the health of the consumer, then they can prescribe what the citizen of the city shall eat by prohibiting the sale of all other food. The legislature or any of its creatures has no such power. The exercise of such power, we have seen, would be a violation of the inalienable right of man to procure healthy and nutritious food, by which life may be preserved and enjoyed. It would be an interference with the liberty of the citizen, which is not necessary to the protec-

tion of others or the public health,—would be an invasion of his personal rights.

Professor Tiedeman, in his work on the "Limitations of Police Powers," in elucidation of this doctrine, says: "A still stronger ground for the total prohibition of a trade or business is when the thing offered for sale is in some way injurious or unwholesome. It is not enough that the thing may become harmful, when put to a wrong use. It must be in itself harmful, and incapable of a harmless use. Poisonous drugs are valuable, when properly used, but they may work serious injury by being improperly used, even to the extent of destroying life. Safeguards of every kind can be thrown around the sale of them, so that damage will not be sustained from an improper use of them, but that is the limit of the police control of the trade. Thus, for example, opium is a very harmful drug, when improperly used, and it is all the more dangerous because the power of resistance diminishes rapidly in proportion to the growth of the habit of taking it as a stimulant, and a miserable, degraded death is the usual end. * * But, on the other hand, opium is a very useful, and indispensable drug. * * * The sale of it can, of course, be prohibited to minors, and to all who may be suffering from some form of dementia, and to confirmed opium eaters. But it would seem to be taking away the free will of those who are under the law confessedly capable of taking care of themselves, if the law were to prohibit the sale of opium to adults in general. But where a thing may be put to a wrongful and injurious use, and yet may serve in some other way a useful purpose, the law may prohibit the sale of such things in any case where the vendor represents them as fit for a use that is injurious, or merely knows that the purchaser expects to apply them to the injurious purposes. Thus the sale of diseased or spoiled meats or other food, as food, intending or expecting that the purchaser is to make use of them as food, may be prohibited. So, also, the sale of milk which comes from cows fed in whole or in part upon still slops may be prohibited, if it is true that such milk is unwholesome as human food. In the same manner a law was held to be constitutional which prohibited the sale of illuminating oil which ignited below a certain

heat. But it would be unconstitutional to prohibit altogether the sale of either of these things, if they could be employed in some other harmless and useful way. For example, the oil which was prohibited for illuminating purposes may be very valuable and more or less harmless while used for lubricating purposes." Pp. 293–295. See also *Des Plaines* v. *Poyer*, 123 Ill. 348; *Babcock* v. *City of Buffalo*, 56 N. Y. 268.

The legislature may enact such laws as may be necessary to protect the public against fraud, imposition, or deception, in the sale of food, or any impurities, putridity, disease, or un-soundness in the same which renders it unwholesome, and may authorize municipal corporations to do so. The public is entitled to protection against imposition by the sale of impure or adul-terated food, or of imitations as pure and genuine. In this respect it needs protection, and to this end the legislature may and can authorize city councils to pass laws. It has accord-ingly been held that an act is constitutional which prohibits the sale of "milk containing more than eighty-eight per centum of water fluids, or less than twelve per centum of milk solids, or less than two and one-half per centum of milk fats." In pass-ing upon the validity of this act, in *State* v. *Smyth*, 14 R. I. 100, the court said: "It is equally a fraud on the buyer, whether the milk which he buys was originally good and has been deteriorated by the addition of water, or whether in its natural state it is so poor that it contains the same proportion of water as that which has been adulterated. * * * If a cow habitually gives milk of a quality so poor as to come within the statute, or, as the defendant puts it in his brief, so poor that as a commercial commodity it is val-uable only for the purpose of irrigation, she is of no value as a milk producer, and can have none as such to her owner, unless he can sell her milk to his unsuspecting neighbor for a price greatly in excess of its value, a species of fraud which ought not to be tolerated. The section is but a slight extension of of the provision which prohibits the sale of adulterated milk, and, like that, was designed to protect the public against impos-ition." *Comm.* v. *Waite*, 11 Allen, 264; *People* v. *Cipperly*, 101 N. Y. 634. Other examples might be given, but this, we think, is sufficient.

The ordinance in question, for the reasons indicated, is unreasonable, invalid and void, and the judgment of the circuit court so holding is affirmed.