## Commonwealth v. Hnath

*Howard R. Berninger*, District Attorney, for Commonwealth.

*Smith & Eves*, for defendant.

KREISHER, P. J., July 1, 1960.—On Tuesday, September 23rd of Fair week in 1958, the prosecuting agent for the Pennsylvania Bureau of Foods and Chemistry was securing ice cream and ice milk samples from the various stands set up on the Bloomsburg fairgrounds for the sale of these products. He would take a sample of the finished product from the machine by filling a pint jar. He would then seal and label the jar and place it in a dry ice refrigerator in the rear of his automobile. He continued the performance of his duties for the bureau until September 29th, at which time he delivered the innumerable samples to the Kirby Health Center in Wilkes-Barre for examination and tests.

Sometime thereafter, the agent received the results of the tests which indicated the product taken from defendant's machine, which was advertised as ice cream and under the law should have contained at least 10 percent butterfat was only ice milk and contained less than five percent butterfat.

As a consequence thereof, the agent lodged an information against defendant for a violation of the Ice Cream Law of May 20, 1949, P. L. 1594, as amended May 8, 1956, P. L. 1542, 31 PS §407, and Regulation of the Bureau 408-B.

Without quoting the act and the accompanying regulation, the law merely provides that a product advertised as ice cream must contain not less than 10 percent butterfat and any product containing less than five percent butterfat must be advertised as ice milk.

The bacteria count was within the prescribed limits of the act so the charge is confined to the one issue, that of insufficient percentage of butterfat in the product.

The defense in this case is a novel but logical one, and under the facts and circumstances, we feel worthy of due consideration and not without some merit.

Defendant testified that he is a resident of Pottstown, R. D. No. 2, that in the latter part of August 1958, he purchased the equipment which he brought to the Bloomsburg fair at a price in excess of $11,000. The equipment was brand new and the best available at the time on the market, made of stainless steel with tile floors and completely air-conditioned.

He began his business at the Reading fair and then attended the Allentown fair, the following week. Then he came to the Bloomsburg fair from Allentown.

Defendant is a graduate of Marquette University and holds an industrial engineer's degree. He testified that he came to Bloomsburg from the Allentown fair on Sunday evening and because of the inclement

weather, he did not set up his equipment until the next day.

He testified that he brought no mix from the Allentown fair, but on Monday he purchased from the Clewell Creamery truck a 12 percent butterfat content ice cream mix and that he paid the Clewell Creamery for a 12 percent mix. This testimony was corroborated by the records of the Clewell Creamery which showed that all of the mix purchased by defendant was a 12 percent mix.

The chemists for the Clewell Creamery testified that their truck delivered to the fairgrounds a 12 percent mix for ice cream and a five percent mix for ice milk so that it was not beyond the realm of possibility that a can of milk could have been mislabeled. In addition to this possibility of a mistake, it is likewise not beyond the realm of possibility that a mistake could have been made at the testing laboratory because the agent testified that he had innumerable samples in the back of his car for approximately one week and that they were identified by the pasting of a paper label on the contents.

The agent also testified that during the course of his investigation, he took samples from both ice cream stands and ice milk stands, so that his samples contained both types of mix.

We are not unmindful of the cases under the Milk Control Law and under the Pure Foods Law that intention to violate the law is not an element of the crime and that a showing that the law was violated automatically subjects the offender to the penalty.

In Wharton's Criminal Law, Vol. 1, 12th Ed., page 572, sec. 399, it is stated:

"In the early history of the common law such acts only were deemed criminal as had in them the vicious element of an unlawful intent, indicating a deviation from moral rectitude; but this quality has ceased to

be essential, and now acts which are unobjectionable in a moral view, except in so far as being prohibited by law makes them so, constitute a considerable portion of the criminal code of every state. Under such statutes the act is expressly prohibited, without reference to the intent or purpose of the party committing it; and is usually of the class in which the person committing it is under no obligation to act, unless he can do so lawfully, and it is no defense that the person acted honestly and in good faith, under a mistake of fact, for he is bound to know the fact as well as the law, and he acts at his peril. Under such statutes guilty knowledge is not one of the essential ingredients of the offense."

Now, confronted with the foregoing general principle which is today firmly established in the law, can the court under the foregoing statement of facts find defendant guilty beyond a reasonable doubt? And has the Commonwealth met the burden raised of proving the alleged violation of a criminal statute which must be strictly construed?

It is generally held that adulterated foods being prohibited by statutes, the seller of such articles takes upon himself the responsibility of knowing that they are not adulterated. See footnote No. 4 on page 577 of Wharton's Criminal Law, vol. 1, sec. 399.

The milk sales manager of the Clewell's Creamery testified that he visited defendant's stand on a number of occasions, and that in addition to the inclement weather, he had a very poor location on the grounds and that he did not at anytime seem to be doing a very big business.

He then testified that during the week defendant purchased nine 40-quart cans of ice cream mix with approximately 20 percent overrun. This would indicate defendant sold about 108 gallons of ice cream.

In order to cut 12 percent butterfat to five percent, it would have been necessary to add approximately 58 percent skimmed milk, which would mean with the 20 percent overrun, a total of approximately 294 gallons, and that in his opinion defendant during the week sold nowhere near that amount of ice cream.

The creamery records further show that defendant bought throughout the week only 12 quarts of skimmed milk and this was purchased along with 12 quarts of regular milk which defendant testified he used for coffee.

Defendant also testified that he moved his equipment from the Bloomsburg fair to the fairs in Maryland where he received a certificate of award for his excellent product because of his new and efficient equipment. However, we have before us a product that did not meet the test according to law and it becomes our duty to administer the law in accordance with the intent of the legislature.

One of the early and able opinions dealing with a situation of this nature arose under the Oleomargarine Act of 1885 and the Supreme Court in the case of Commonwealth v. Weiss, 139 Pa. 247, contains the following language (p. 250) :

"Guilty knowledge or guilty intent is, in general, an essential element in crimes at the common law, but statutes providing police regulations, in many cases make certain acts penal, where this element is wholly disregarded. The distinction is thus laid down in 3 Greenl. Ev., §21: 'The rule' (i.e., that ignorance of fact will excuse) 'would seem to hold good in all cases where the act, if done knowingly, would be malum in se. But, where a statute commands that an act be done or omitted, which, in the absence of such statute, might have been done or omitted without culpability, ignorance of the fact or state of things contemplated by the statute, it seems, will not excuse its violation.

Thus, for example, where the law enacts the forfeiture of a ship having smuggled goods on board, and such goods are secreted on board by some of the crew, the owners and officers being alike innocently ignorant of the fact, yet the forfeiture is incurred notwithstanding their ignorance. Such is also the case in regard to many other fiscal, police, and other laws and regulations, for the mere violation of which, irrespective of the motives or knowledge of the party, certain penalties are enacted; for the law in these cases seems to bind the parties to know the facts, and to obey the law at their peril.' To the same effect, also, is Wharton, Crim. Law, §§83, 2442.

"Whether a criminal intent, or a guilty knowledge, is a necessary ingredient of a statutory offense, therefore, is a matter of construction. It is for the legislature to determine whether the public injury, threatened in any particular matter, is such and so great as to justify an absolute and indiscriminate prohibition. Even if, in the honest prosecution of any particular trade or business, conducted for the manufacture of articles of food, the product is healthful and nutritious, yet, if the opportunities for fraud and adulteration are such as threaten the public health, it is undoubtedly in the power of the legislature, either to punish those who knowingly traffic in the fraudulent article, or, by a sweeping provision to that effect, to prohibit the manufacture and sale altogether. The question for us to decide, therefore, is whether or not, from the language of the statute, and in view of the manifest purpose and design of the same, the legislature intended that the legality or illegality of the sale should depend upon the ignorance or knowledge of the party charged.

"The statute in question was an exercise of the police power, and the act was sustained upon this ground, not only in this court, but also in the Supreme

Court of the United States: Powell v. Commonwealth, 114 Pa. 265; Powell v. Pennsylvania, 127 U. S. 678.

"The prohibition is absolute and general; it could not be expressed in terms more explicit and comprehensive. The statutory definition of the offense embraces no word implying that the forbidden act shall be done knowingly or wilfully, and, if it did, the design and purpose of the act would be practically defeated. The intention of the legislature is plain, that persons engaged in the traffic shall engage in it at their peril, and that they cannot set up their ignorance of the nature and qualities of the commodities they sell, as a defense."

In the case of Commonwealth v. Fine, 166 Pa. Superior Ct. 109, it is stated on pages 113 and 114 that:

"The reasons for sustaining legislation which makes certain acts crimes and punishable as such without regard to defendant's motive, intent, reasonableness or good faith, are stated to be: (1) To require a degree of diligence for the protection of the public and (2) convenience of enforcement."

In the case of Commonwealth v. Hackney, 117 Pa. Superior Ct. 519, at page 524, it is stated:

"Direct proof of a guilty intent is not always necessary in a prosecution for violation of a statute. Whether it is incumbent upon the Commonwealth to show a criminal knowledge or intent as an essential ingredient of a statutory offense is generally a matter of construction, to be determined by the language of the statute."

The Ice Cream Act of May 20, 1949, P. L. 1594, as amended May 8, 1956, P. L. 1542, sec. 1, provides that:

"For the purpose of this act, 'ice cream' is defined as any frozen sweetened milk product which is agitated during the process of freezing; and includes every such frozen milk product which contains more than five per centum (5%) by weight of milk fat,

milk solids not fat, or milk fat and milk solids not fat, and which in any manner simulates the texture or characteristic of ice cream, no matter under what coined or trade name it may be sold, but ice cream does not include 'ice milk.' . . ."

The Act further provides that:

"The finished product shall contain not less than ten per centum (10%) of milk fat by weight except when fruit, nuts, cocoa or chocolate, cakes or confections are added for the purpose of flavoring, then it shall contain not less than ten per centum (10%) by weight of milk fat except for such reduction in milk fat as is due to the addition of such flavoring, but in no case shall it contain less than eight per centum (8%) by weight of milk fat, and chocolate and cocoa flavored ice cream shall in no event contain less than ten per centum (10%) of total fat."

The next section of the Act of Assembly states that:

"It shall be unlawful for any person by himself or by his agents, servants, or employes, to sell, offer for sale, expose for sale, or have in possession with intent to sell, ice cream, etc., which is adulterated, within the meaning of said act."

The Amendatory Act of May 8, 1956, P. L. 1542, sec. 1, 31 PS §414, provides in the second paragraph that:

"The Department of Agriculture shall adopt, promulgate and enforce, rules and regulations to carry out the purpose of this act, and especially to carry out the following purposes of this act (1) to prevent deception in the sale of ice cream and the other products herein defined, and (2) to safeguard the health of consumers and to safeguard the manufacture of ice cream and the other products herein defined, whether manufactured in a regular manufacturing plant or in a counter freezer."

In conformity with the foregoing statutory authorization, the Bureau of Foods and Chemistry of the Department of Agriculture under date of April 15, 1957, published a bulletin fixing standards for milk and milk products and otherwise regulating the production and sale of milk and milk products other than cheeses, ices and frozen confections.

Under section 408, chapter IV, of this official bulletin, we find a summary of minimum standards and other information pertaining to ice cream which is in conformity with the above-quoted section of the Ice Cream Act making the minimum butterfat content of ice cream, other than fruit or nut, 10 percent and with fruit or nuts, eight percent.

The penal provision of the Act of May 20, 1949, P. L. 1594, as amended in 1956, provides among other things, as follows (31 PS §415):

"Any person violating any of the provisions of this act, or definition and standard of the Department of Agriculture made pursuant thereto, shall, for the first or second offense, upon conviction thereof in a summary proceeding, be sentenced to pay a fine of not less than twenty-five dollars ($25.00) nor more than one hundred dollars ($100.00) and costs of prosecution, or, in default of such fine and costs, in the case of an individual or the officers and members of an association, partnership, or corporation, to undergo an imprisonment in the county jail of not less than thirty (30) days nor more than sixty (60) days."

Then follows the penalty for subsequent offenses and a provision that all fines and penalties imposed and recovered for the violation of any of the provisions of the act shall be paid into the State Treasury through the Department of Revenue and credited to the general fund.

From the foregoing examination of the act in question, it is apparent that the legislature did not speci-

fically provide that proof of guilty knowledge or intent is essential to impose liability for failure to comply with the act, and it therefore follows that the very direct wording of the act imposes an absolute liability upon the vendor to make certain that the product he is advertising for sale meets the requirements of the act and his failure to do so imposes an absolute liability.

In fairness to the Commonwealth, since our conclusion requires us to impose this liability, we should point out that the chemist who made the test was very positive in his analysis and identification of the sample. Likewise, the agent who took the sample and took it to the chemist for analysis was very positive there was no mixup in the samples, so the last possibility we deem worthy of mention is that this defendant who moved to the Bloomsburg fair from the Allentown fair and was confronted with inclement weather on both Sunday and Monday of the Bloomsburg fair week and did not set up his stand for operation until Tuesday, could have used a product that he secured from a source other than the Clewell's Creamery and intending to dispose of that surplus or product first, he must suffer the consequences.

However, as we stated at the outset that defendant impressed us with his sincerity and that his defense did merit serious consideration, we feel justified in imposing only the very minimum sentence, and to this end, we make the following:

### Order of Court

And now, to wit, July 1, 1959, we adjudge defendant guilty and direct the District Attorney to notify said defendant to appear in open court for sentence on July 27, at 11 a.m. unless in the meantime defendant shall have paid the costs of prosecution and a fine of $25 to the Commonwealth.