EL PUEBLO, DEMANDANTE Y APELADO, *v.* CORREA, ACUSADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Humacao en causa por infracción a una ordenanza municipal.

No. 1948.—Resuelto en febrero 23, 1923.

CONSTITUCIONALIDAD DE UNA ORDENANZA MUNICIPAL; CÓMO PUEDE SER PROMOVIDA—EXCEPCIÓN PERENTORIA POR INCONSTITUCIONALIDAD.—Una cuestión constitucional puede ser promovida por excepción perentoria.

ORDENANZA MUNICIPAL ANTICONSTITUCIONAL—MONOPOLIO PARA LA VENTA DE CARNES POR EL MUNICIPIO.—Aparte que en la Ley Municipal de 1919 no se reservó a los municipios la facultad de establecer monopolios en la venta de carnes frescas, lo cual entraña la derogación de la Ley núm. 52 de 1917 en cuanto les concedía tal facultad, dicha ley es, además, anticonstitucional en cuanto autoriza a los municipios para promulgar ordenanzas prohibiendo la venta de carnes frescas en la municipalidad a cualquier persona que no sea un representante del gobierno municipal. Consecuentemente, una ordenanza municipal estableciendo tales monopolios y prohibición, es anticonstitucional.

ID.—*Police Power*—DERECHO AL LIBRE EJERCICIO DE PROFESIONES U OFICIOS LÍCITOS.—Bajo el mero pretexto de reglamentaciones de policía (*police power*) los derechos personales no pueden ser usurpados, pues el derecho a seguir cualquiera de las ocupaciones comunes a la vida es un derecho inalienable bajo la Constitución americana.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. F. Piñero.*

Abogado del apelado: *Sr. José E. Figueras, Fiscal.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

Cruz Correa de Jesús fué declarado culpable de un delito menos grave por virtud de una denuncia formulada contra él y que en esencia es como sigue: Que en enero 28, 1922, en una casa dentro del Distrito Judicial Municipal de Caguas el referido Cruz Correa de Jesús sacrificó y puso a la venta carne de res en un puesto situado en dicha casa, vendiéndola al público, violando de este modo la sección 1ª. de "Una ordenanza para reglamentar la matanza de ganado vacuno y la venta de carnes frescas por administración, en el Municipio de Caguas, Puerto Rico." La ordenanza fué la siguiente:

"Yo, Ramón Santini, Secretario Municipal de Caguas, P. R., CERTIFICO:—Que la Asamblea Municipal de Caguas, en su sesión del 24 de octubre de 1921, adoptó la siguiente ordenanza, que fué publicada en el periódico 'La Democracia,' en su número correspondiente al día veintiocho de octubre de 1921, entrando a regir el 18 de noviembre del mismo:

"Ordenanza reglamentando la matanza de ganado vacuno para la venta de carnes frescas por administración en el Municipio de Caguas, P. R., y fijando penalidades por su infracción.—Ordénase por la Asamblea Municipal de Caguas:

"Sección 1.—Por la presente se dispone y establece en el Municipio de Caguas, temporalmente, la matanza de ganado vacuno para la venta de carnes frescas, por administración; *Disponiéndose* que las carnes serán vendidas a los habitantes del Municipio, al costo con más el diez por ciento de beneficio; y todo lo recaudado por este concepto ingresará en el Tesoro Municipal. *Disponiéndose, además,* que ninguna persona o personas, fuera de los representantes oficiales del Gobierno Municipal, podrán vender carnes frescas en los límites del Municipio de Caguas, durante el tiempo que esta ordenanza estuviere vigente.

"Sección 2.—Las carnes serán vendidas al público consumidor completamente limpias y desteladas, y en la proporción de ¾ partes de carnes por ¼ de hueso.

"Sección 3.—Los precios de las carnes serán fijados diariamente en una tablilla colocada en sitio visible. Toda persona o personas que alterasen estos incurrirán en las penalidades que señala la sección cuarta sub-siguiente.

"Sección 4.—Toda persona que infringiere cualquiera de las disposiciones de esta ordenanza, convicta que fuere, será castigada

por la Corte Municipal o la de Paz, con multa mínima de Diez Dólares y máxima de Cincuenta, o con prisión mínima de cinco días y máxima de quince.

"Sección 5.—Por la presente se autoriza al Comisionado de Servicio Público para que disponga de los fondos necesarios de la partida de imprevistos para la compra del ganado necesario y demás gastos inherentes a la ejecución de esta ordenanza; *Disponiéndose* que el Concejo de Administración redactará los reglamentos necesarios para la ejecución de la misma.

"Sección 6.—Esta ordenanza empezará a regir a los veinte días siguientes a su publicación, y estará en vigor durante el término de noventa días, pudiendo la Asamblea Municipal prorrogarlo cuantas veces lo estime necesario.

"Sección 7.—Toda ordenanza o parte de ordenanza que se oponga a la presente, queda derogada.

"Y para fines oficiales libro la presente en Caguas, Puerto Rico, a los treinta días del mes de enero de mil novecientos veintidós."

En la corte inferior, al ser presentada una denuncia con tal fin, el acusado formuló la excepción perentoria de que los hechos denunciados no constituían delito público, porque "los hechos tal y como han sido denunciados no constituyen delito público en Puerto Rico, porque la ordenanza cuya infracción se imputa al acusado, nació en virtud de la Ley número 52 aprobada en diciembre 3, 1917, titulada "para autorizar a los Municipios para reglamentar la venta de carnes frescas" cuya ley fué totalmente derogada por el propio mandato de la Asamblea Legislativa de Puerto Rico, al aprobar, el año 1919, la Ley Municipal que rige en Puerto Rico, no incluyendo entre las leyes que debían subsistir en la vida de los municipios, la expresada ley número 52; segundo, porque viola un precepto constitucional amparado por la Constitución de los Estados Unidos de Norte América, y además, porque viola un precepto comprendido en el Acta Jones, que establece que no se aprobará ninguna legislación que menoscabe los contratos; tercero, porque dicha ordenanza ha sido aprobada, excediéndose la corporación municipal del radio de acción concedídole, por el *Police Power,* de acuerdo con

el acta que la creó, y cuarto, porque dicha ordenanza establece un negocio que constituye un monopolio verdadero, en abierta oposición a las constituciones del Acta Sherman, que es aplicable a Puerto Rico.

Alega el apelante varios errores para atacar la validez de esta ordenanza y entre otros señalamientos hay algunos que afectan a la constitucionalidad de la ley número 52 de 1917, así como a la de la propia ordenanza. El gobierno sostiene la validez de la ley en todo sentido menos en lo que respecta a la cuestión de la constitucionalidad. En relación con esto dice el gobierno que la cuestión de la constitucionalidad no fué debidamente planteada, pero asumiendo que fué propiamente levantada, entonces el gobierno conviene en que la ley es anticonstitucional.

Sostiene el gobierno la teoría de que para atacar la constitucionalidad de una ley debe haberse presentado una moción especial en la corte inferior levantando la cuestión. Los autos revelan que el acusado formuló una excepción perentoria ante la corte, levantando todas las cuestiones. La opinión de la corte también demuestra que el acusado levantó debidamente y presentó cuestiones sobre la constitucionalidad de la ley número 52, *supra,* y de la anticonstitucionalidad e irrazonabilidad de la ordenanza, por constituir una violación de los derechos individuales. No solamente fué levantada la cuestión en esta forma, sino que la corte en su opinión pasa a discutir la constitucionalidad de la ley y a justificar la misma y al municipio, basada en la teoría del poder de policía del Estado. Las citas que hace el fiscal son simplemente al efecto de que una cuestión constitucional debe ser levantada en la corte inferior. Siempre hemos entendido que una cuestión constitucional podría ser promovida por excepción perentoria. Así fué planteada, considerada y resuelta por la corte inferior. No conocemos ninguna autoridad que prescriba otra forma necesaria de promover la cuestión. Aún más, si hubiera habido alguna deficiencia en

la forma en este sentido, sobre ella no se insistió en la corte inferior y de acuerdo con nuestras facultades generales, podríamos pasar por alto una deficiencia de forma. La ley número 52 de 1917 es la siguiente:

"Ley para autorizar a los municipios a reglamentar la venta de carnes frescas.

"*Decrétase por la Asamblea Legislativa de Puerto Rico:*

"Sección 1.—Los municipios de Puerto Rico quedan autorizados para reglamentar la venta de carnes frescas de acuerdo con las necesidades existentes en cada municipalidad, en cualquiera de las formas siguientes:

"(*a*) Por medio de subastas.

"(*b*) Por administración.

"(*c*) Autorizando la matanza libre.

"Sección 2.—Los municipios que deseen regular la venta de carnes frescas por subastas lo harán mediante ordenanza debidamente decretada, proveyendo lo necesario para la celebración de subastas con el fin de adjudicar el privilegio exclusivo de vender carnes frescas en los límites del municipio, a la persona o personas que ofrecieren vender dichas carnes al público al precio más bajo. Todas las ordenanzas que para el objeto se decretaren fijarán el término de su vigencia y proveerán lo necesario para anuncios de las subastas que hayan de celebrarse semanal o quincenalmente en la forma y manera que más adelante se dispone. En dichas ordenanzas podrá ordenarse también que sólo las personas a quienes se haya adjudicado debidamente el privilegio podrán vender carnes frescas en el municipio, y fijarse penas por la infracción de esta restricción, que no excedan de multa de cincuenta (50) dólares o prisión por treinta (30) días por cada falta; *Disponiéndose,* que las subastas serán anunciadas por pliegos que se fijarán en el frontis de la casa ayuntamiento.

"Cada semana o quincena se especificará en el anuncio de las subastas la cantidad mínima de cada clase de carne necesaria para el consumo público en cada uno de los días contenidos en el período, y el precio máximo al cual pueden venderse dichas carnes en cada uno de dichos días.

"Toda proposición especificará la cantidad y clase o calidad de cada clase de carne que el postor conviene en ofrecer a la venta, y el precio que se compromete a cargar por ella en cada uno de los

días comprendidos en su proposición; *Disponiéndose,* que cualquiera proposición puede cubrir todos los días comprendidos en la semana o quincena, o cualquier número de dichos días. La junta de subasta, según está constituída por la sección 96 de la Ley Municipal, adjudicará la buena pro, y el privilegio para la venta de cada clase de carne fresca se adjudicará para cada día del período de la subasta al postor que ofreciera venderla al precio más bajo en aquel día, consideración habida de la clase o calidad de la carne que se ofreciere.

"Cada proposición vendrá acompañada de una fianza provisional, en efectivo, y cada mejor postor depositará una fianza definitiva en efectivo bajo condición de cumplir fielmente todas las condiciones de su convenio en todos y cada uno de los días para los cuales le ha sido adjudicado el privilegio. La cantidad de estas fianzas se fijará en la ordenanza proveyendo para la concesión del privilegio.

"La junta de subastas tendrá el derecho de rechazar todas las ofertas para cualquier día o días del período semanal o quincenal, en el cual caso, así como en casos de no hacerse ofertas para ningún día o días del período, el concejo municipal tendrá el derecho de solicitar nuevas proposiciones para esos días, o disponer lo más conveniente para los intereses del municipio.

A los que se les adjudicare el privilegio de vender carnes se les permitirá el uso de los mataderos y puestos de carnes pertenecientes al municipio en los días para los cuales se hubiere adjudicado dicho privilegio, mediante el pago de derechos razonables que para ello fijare el concejo municipal, y con sujeción a los reglamentos que dicha corporación estableciere.

"Sección 3.—Los municipios que deseen establecer la venta de carnes frescas por administración lo harán mediante ordenanza debidamente decretada, para proveer temporalmente para la matanza de ganado y la venta de carnes por el municipio en la forma y manera dispuesta en la sección 104 de la Ley Municipal. Cualquiera ordenanza que con este fin se decretare podrá disponer que ninguna persona o personas, fuera de los representantes del gobierno municipal, representando oficialmente al municipio, podrán vender carnes frescas en los límites del municipio durante el tiempo que la ordenanza estuviere vigente, y podrá fijar penas que no excedan de multas de cincuenta (50) dólares o prisión por treinta (30) días por cada falta de infracciones de esta restricción.

"Sección 4.—Los municipios que deseen establecer la matanza libre deberán reglamentarla por ordenanza debidamente decretada.

"Sección 5.—La Ley No. 76, de marzo 9 de 1911, y toda otra ley o parte de ley que se oponga a la presente, queda por ésta derogada."

Uno de los principales fines de esta ley fué permitir a los municipios de Puerto Rico establecer monopolios en la venta de carnes, ya por subastas públicas, o por administración, según los prefiriera cada municipio. Cuando venía a constituir un monopolio por el municipio el único requisito previo era la forma y manera prescritas por el artículo 104 de la Ley Municipal. El artículo 104 suponía previamente la aprobación de la ordenanza por el Consejo Ejecutivo de Puerto Rico. Suponiendo previamente entonces la aprobación del Consejo Ejecutivo, la ley número 52 permitiría a cualquier municipio establecer un monopolio en la venta de carnes y podría, de ser general, impedir a todo carnicero en cualquier parte de Puerto Rico o de cualquier lugar de los Estados Unidos ejercer su oficio en Puerto Rico.

El apelante está conforme en que el municipio puede regular, y en último caso fijar, el precio máximo en que podría venderse un artículo determinado, y que ésta fué la práctica que se puso en vigor en los otros municipios de la isla, con la aprobación de la comunidad en general. Esto tendería a mostrar las desigualdades que pudieran surgir en Puerto Rico, toda vez que podría permitirse a un carnicero vender carne en una comunidad y no poder ejercer su oficio en otra. Varios municipios de la isla, mediante subastas o por administración, harían imposible para un carnicero de cualquier otra parte de los Estados Unidos el ejercer su oficio, en Puerto Rico y como muy bien dice el apelante, si el peticionario puede impedir así la venta de carnes por una persona particular, ¿por qué no puede hacerlo también tratándose de harina o de cualquier otro artículo necesario para la vida? En alguna parte de nuestras investigaciones, aunque de momento no tenemos el caso a mano, cuando una legislatura o municipio había tratado de impedir la venta de un determinado

artículo necesario para la vida, el juez que emitió esa opinión dijo que si la venta de un determinado artículo podía ser impedida de tal modo, así también podría serlo hasta la carne, queriendo significar, desde luego, que la venta de carne, que es un artículo de primera necesidad, estaba abierta a la libre competencia y que cualquiera podría elegir el ejercicio de ese negocio. La prohibición absoluta de la venta de carne por individuos particulares no era de pensarse.

Cualquier tentativa para estudiar la materia objeto de la reglamentación de oficios, profesiones, o de cuándo es que puede o no ser creado un monopolio, nos retrotraería a los famosos *Slaughter House Cases,* 16 Wall. 36; y llama bastante la atención que la cuestión envuelta era la matanza de animales para el consumo y el derecho de Louisiana a conferir a una corporación el exclusivo privilegio por veinticinco años de controlar la matanza de dichos animales. Por una corte en que la opinión estaba dividida con fuertes disidencias, el derecho de Louisiana a establecer tal corporación fué mantenido. La opinión de la mayoría emitida por el Juez Sr. Miller, consideró la cuestión de los monopolios bajo la condición de la ley. En los tiempos primitivos los monopolios surgieron por privilegio real, por la actuación de gremios, y en otras formas, hasta que *Lork Coke,* en una renombrada opinión, sostuvo que los monopolios, con pocas excepciones, eran nulos en la ley. 11 Coke 84, b 77, *Reprint* 1260. El Juez Sr. Miller llamó la atención, sin embargo, citando del historiador *Macauley* que la limitación de los monopolios era una protesta de los Comunes contra la Corona; que al llamarse la atención de Elizabeth a esta práctica ella prometió suprimirla. Si lo hizo o no, es otra cuestión. De todos modos, nadie jamás puso en duda que el Parlamento podía establecer un monopolio. La corte, en los *Slaughter House Cases,* resolvió que el ejercicio particular del poder de policía por Louisiana no envolvía ninguna cuestión federal; que la reglamentación de la matanza de ganado es-

taba, y siempre había estado, dentro del poder de policía; que nadie podía dudar que el Estado podría regular la matanza y establecer mataderos públicos, y que si deseaba regularla podría también incorporar una asociación con tal fin. De modo que las enmiendas décimotercera y décimo cuarta a la Constitución de los Estados Unidos no debieron ser invocadas.

A la sugestión de que la incorporación impediría a un carnicero ejercer su oficio, el Juez Sr. Miller dijo: "Pero no es verdad que ella (la ley) priva a los carniceros de su derecho a ejercer su oficio," y también, "ella (la ley), como se ha afirmado, no impide al carnicero hacer su propia matanza."

Se deduce de la opinión de la mayoría que Louisiana no había hecho nada substancial para impedir a un carnicero ejercer su oficio. Las opiniones disidentes de los jueces *Field* y *Bradley* hicieron más clara la posición de la corte. Ellos afirmaron que Louisiana había infringido las enmiendas décimotercera y décimocuarta. Estas opiniones disidentes han sido citadas extensamente por ser una correcta exposición en general del derecho de una persona a ejercer un oficio o profesión, sujeto únicamente a una reglamentación razonable o de acuerdo con las exigencias que el caso pudiera requerir.

En el caso de *Re Aubrey,* 104 A. S. R. (Wash.) 952, un estatuto que exigía a los herradores de caballos pasar un examen y prescribía un castigo por seguir un oficio sin una licencia, fué declarado anticonstitucional. El propósito del estatuto no fué levantar fondos. La corte indicó que un estatuto podría regular la cirugía dental y la medicina como cuestiones de sanidad, de acuerdo con el poder de policía, y citó el caso principal de *Re Jacobs,* 90 N. Y. 108; 50 A. R. 636. "Bajo el mero pretexto de reglamentaciones de policía los derechos personales no pueden ser usurpados * * * " y la corte de Washington citó con aprobación de la opinión del Juez *Field,* del *Slaughter House Cases,* 16 Wall. 87. Asimismo,

en el caso de *Bessette* v. *People* (Ill.), 56 L. R. A. 558. En
29 *Corpus Juris* 242, se dijo substancialmente que una re-
glamentación sanitaria o cuarentenaria no puede ponerse en
vigor de modo que prive a los ciudadanos del ejercicio o goce
de sus derechos legales en una forma que no es perjudicial
o peligrosa para los demás.

Incidentalmente podemos decir que el poder de policía y
el alcance del mismo fué considerado en los *Slaughter House
Cases*. No es susceptible de una definición exacta, como hace
mucho tiempo dijo el Juez Presidente Sr. Shaw. La legis-
latura puede, *prima facie,* determinar la necesidad de la re-
glamentación de un oficio o negocio, pero siempre pueden las
cortes investigar si la cuestión es materia de reglamenta-
ción por el poder de policía.

*Allgeyer* v. *Louisiana,* 165 U. S. 578, probablemente es el
caso más claro de la Corte Suprema de los Estados Unidos
en el cual se conserva el derecho del ciudadano a seguir cual-
quier ocupación ordinaria. La corte dijo lo siguiente:

Se dijo por el Juez Asociado Sr. Bradley en el caso de Buther's
Union Company v. Crescent City Company, 111 U. S. 746, 762, en
el curso de su opinión concurrente en ese caso, que 'El derecho a
seguir cualquiera de las ocupaciones comunes a la vida es un de-
recho inalienable. Se formuló como tal de acuerdo con la frase
"prosecución de la felicidad" contenida en la Declaración de In-
dependencia, que comenzaba con la proposición fundamental de que
"todos los hombres han sido creados iguales, que el Creador les ha
otorgado ciertos derechos inalienables; que entre éstos están la vida,
la libertad y la prosecución de la felicidad. Este derecho es un gran
elemento en la libertad civil del ciudadano." ' Y de nuevo, en la
página 764, el ilustrado juez dijo: 'Sostengo que la libertad para
ejercer una ocupación—el derecho a seguir cualquiera de las voca-
ciones ordinarias de la vida—es uno de los privilegios del ciudadano
de los Estados Unidos.' Y otra vez en la página 765 dice: 'Pero
si no obstaculiza los privilegios e inmunidades de un ciudadano de
los Estados Unidos que le prohibe seguir su vocación y da a los
demás un derecho exclusivo de seguirla, ciertamente que le priva
(hasta cierto punto) de su libertad; pues le quita la libertad de

adoptar y seguir la profesión que prefiera; la cual, como ya se ha sugerido, es parte esencial de la libertad del ciudadano.' ''

Es verdad que estas observaciones se hicieron respecto a cuestiones de monopolio, pero ellas determinan bien los derechos comprendidos en la palabra "libertad," según están contenidos en la enmienda décimocuarta.

Y también, en el caso de *Powell* v. *Pennsylvania*, 127 U. S. 678, 684, el Juez Sr. Harlan, al emitir la opinión del tribunal, se expresó como sigue:

"La principal cuestión que levanta previamente el demandado es que, en términos de igualdad con todos los demás en semejantes circunstancias del disfrute por su parte del privilegio de seguir una profesión o negocio habitual, y de adquirir, tener y vender la propiedad, es una parte esencial de sus derechos de libertad y de propiedad, como están garantizados por la enmienda décimocuarta. La corte conviene con esta proposición general por encarnar un saludable principio de derecho constitucional."

Se resolvió allí, sin embargo, que la legislación que se considera en ese caso no infringía ningún derecho constitucional del demandante en error.

El caso de *Smith* v. *Texas*, 233 U. S. 630, fué uno en el cual se exigían requisitos indebidos al conductor de un tren. La corte dijo lo siguiente:

"La vida, libertad, propiedad, y la igual protección de la ley, agrupadas conjuntamente en la Constitución, están tan relacionadas entre sí que la privación de uno de esos derechos puede aminorar o extinguir el valor de los otros tres. En tanto se priva a un hombre del derecho a trabajar, su libertad queda restringida, su capacidad para ganarse la vida y adquirir propiedad rebajada, y se le niega la protección que la ley proporciona a aquellos a quienes se les permite trabajar. Libertad significa más que inmunidad de servidumbre, y la garantía constitucional es una seguridad de que el ciudadano será protegido en su derecho a usar sus facultades mentales y corporales en cualquier ocupación legal.

"Si el servicio es público el Estado puede prescribir restricciones y exigir un examen para probar la capacidad de cualquier persona para dedicarse o permanecer en la ocupación pública. Ex parte

Lockwood, 154 U. S. 116; Hawker v. New York, 170 U. S. 189; Watson v. Maryland, 218 U. S. 173. El patrono particular puede a la vez fijar normas y pruebas, pero si su negocio es uno en el cual está envuelta la salud o seguridad pública, el Estado puede legislar de modo que se excluya de tal ocupación particular a aquellos cuya incompetencia podría ocasionar perjuicios al público. Pero como el interés público es la base de tal legislación, las pruebas y prohibición deben ponerse en práctica con referencia a ese objeto y de manera que no 'intervengan indebidamente con el negocio en particular, o impongan restricciones inusitadas e innecesarias a las ocupaciones legales.' " *Lawton* v. *Steel,* 152 U. S. 133, 137.

El caso de *Abbey Land & Improvement Company et al.,* v. *County of San Mateo et al.,* 167 Cal. 434 52 L. R. A. (N. S.) 408, es otro ejemplo de hasta qué punto pueden o no llegar las autoridades en la reglamentación del negocio. Cualquier cosa que sea un estorbo público (*nuisance,*) como lo es un matadero frecuentemente, puede quedar circunscrita a cierta parte de la comunidad o que se sitúe fuera de los límites de la ciudad, etc. En el caso en cuestión se trataba de un crematorio. El Condado de San Mateo pretendió otorgar un derecho exclusivo para un sólo crematorio. Los demandantes habían empezado a hacer otro crematorio en esa parte del Condado de San Mateo donde no había nada más que cementerios. La corte resolvió que el vecindario en el cual el demandante se proponía construir y tener un crematorio no era de tal naturaleza que exigía la supresión o prohibición del mismo aún cuando inherentemente fuera tan perjudicial a la salud o conveniencia pública como un cementerio. Era claro que el uso de otro crematorio en esa vecindad en manera alguna sería perjudicial a la salud pública, comodidad o conveniencia y que no perjudicaría a la propiedad colindante. La corte se expresó en estos términos:

"El aumento del precio del mercado de tal propiedad puede retardarse debido a la aversión que muchas personas muestran a residir cerca de un cementerio, pero esto, como hemos visto no es una razón para el ejercicio del poder de policía" (citándose casos).

Se admitió que el crematorio puede funcionar en una forma que pueda causar daño a la salud pública pero cuando se evitaba tal peligro por su situación, no había otra razón para impedir el establecimiento de un crematorio.

Y citando otra vez:

"La ordenanza en cuestión no puede ser sostenida como una medida de policía y puesto que prohibe a los demandantes usar su propiedad en un negocio legal y en una forma inofensiva debe ser declarada nula. *   *   *"

De acuerdo con un estatuto que permite la reglamentación de agencias funerarias una municipalidad negó una licencia a un agente funerario porque no era un embalsamador. La corte de revisión dijo que la Constitución de Massachussetts como la de los Estados Unidos fijaba derechos a disfrutar de la vida, la libertad y la propiedad. "Esto incluye el derecho a ejercer cualquier vocación adecuada para obtener la subsistencia," citándose numerosos casos. La corte resolvió que por virtud del ejercicio del poder de policía los negocios que requieren reglamentación en interés de la salud, seguridad o moral y "quizás en el sentido estricto del bienestar público," podrían ser regulados; que el negocio de agencias funerarias, en beneficio de la salud, podría ser regulado pero no de tal modo que establezca un monopolio por parte de los embalsamadores; que el embalsamamiento no era indispensable para el entierro. La corte también incidentalmente dijo que el mero calificativo de que la reglamentación era una medida sanitaria no era suficiente. *Wyeth* v. *Thomas,* 23 L. R. A. (N. S.) 147.

En el caso de *State Ex rel. Sampson* v. *Sheridan,* 1 A. L. R. 955 contiene una buena exposición del principio, citando el Juez Field en el caso de *Butchers' Union, etc.,* v. *Crescent City, etc.,* 111 U. S. 757, quien se expresó como sigue:

"Se ha dicho muy bien que 'la propiedad que toda persona tiene

en su propio trabajo, puesto que es la base fundamental de toda otra propiedad; es por tanto lo más sagrado e inviolable. El patrimonio del pobre descansa en la fortaleza y destreza de sus manos, y el impedir que emplee esta fuerza y destreza en la forma que lo crea conveniente sin perjuicio a su vecino, constituye una clara violación de la más sagrada propiedad. Es una usurpación manifiesta a la justa libertad tanto del trabajador como de aquellos que podrían estar dispuestos a emplearlo. Así como impide a uno trabajar en lo que crea conveniente, así también obstaculiza a los demás para emplear a quienes consideran convenientes. *Adam Smith, Wealth of Nations,* bk. 1, Chap. 10.''

En el caso de *Marymont* v. *Nevada State Banking Bd.,* 32 L. R. A. (N. S.) 477, se resolvió que el Estado no podía limitar un negocio bancario a una corporación; que todas las ocupaciones estaban sujetas a reglamentaciones, razonables pero que no había ningún beneficio para el público en esta clase de reglamentaciones, citándose al Juez Bradley en los *Slaughter House Cases.*

Un estado puede hacer que las reglamentaciones de un matadero tengan aplicación al ganado sacrificado para exportación. *Board of Health of New Jersey* v. *Schwarz,* 87 Atl. 147. Una ordenanza puede llegar hasta el límite de prohibir la venta de carne a menos que sea inspeccionada. *Field* v. *Board, etc.,* 90 Atl. 672.

Una licencia para poseer, funcionar o administrar una oficina dental, para que pueda ser concedida sin examen que demuestre la capacidad, no puede ser exigida de acuerdo con el poder de policía del Estado cuando no hay ninguna intención de dedicarse a la verdadera práctica de la cirugía dental. *State of Washington* v. *Brown,* 68 L .R. A. 889, donde se dice que un farmacéutico que prepara recetas debe tener una licencia pero que tal no es el caso tratándose del dueño de una farmacia, citando de la obra de *Tiedemann* sobre limitaciones al poder de policía, pero es una cuestión judicial si una ocupación u oficio determinado no puede ser restringido de acuerdo con la limitación constitucional.

Que el oficio es libre y que cualquier hombre tiene el de-
recho de seguir una ocupación también se sostiene en el caso
de *Standard Oil Co.* v. *United States,* 221 U. S. 53; *People* v.
*Weiner,* Ann. Cases, 1917 C 1065. Y en este último caso se
dice que bajo la Constitución Federal y las de Estados la
persona puede ocuparse sin estorbo u obstáculo en todos
aquellos oficios u ocupaciones que son en sí inofensivos y no
perjudiciales al público.

En el tomo 6 de Ruling Case Law, pág. 217, también se
considera la jurisprudencia en donde se sostiene que el dere-
cho de reglamentación es una excepción a la regla general
de que toda persona tiene el derecho de dedicarse a cualquier
profesión legal; que este derecho de reglamentación depende
de la necesidad razonable de su ejercicio en proteger la sa-
lud, moral o bienestar general del Estado; y que por tanto si
un negocio legal es de naturaleza beneficiosa y no perjudi-
cial al público ya directa o indirectamente no puede estar su-
jeto a ninguna reglamentación de policía y (página 19) que
la conducción de un negocio puede prohibirse enteramente en
un caso determinado o en una forma particular; su manejo
puede ser restringido a ciertas horas del día, puede permi-
tirse que se lleve a cabo solamente en el caso de que se empleen
medidas protectoras o puede permitirse en ciertas formas y
exigirse una suma de dinero dé los individuos que lo llevan a
cabo con el fin de recompensar a aquellos que sufran pérdi-
das debido al mismo y en la página 222, que la legislatura no
puede prohibir a ninguna persona o clase de personas de ocu-
parse en un negocio legal; ni puede tampoco privar a nin-
gún ciudadano de su derecho a ejercer una profesión, ocupa-
ción o negocio que no sea necesariamente perjudicial a la
comunidad, y que está dispuesto a cumplir con todas las re-
glamentaciones razonables que se le impongan.

Que la reglamentación y sostenimiento de casas de vecin-
dad para el alojamiento y hospedaje era materia adecuada
de reglamentación legislativa fué declarado en el caso de

*Bonnett* v. *Vallier*, 17 L. R. A. (N. S.) 486, pero la corte sostuvo que el grado de reglamentación permisible variaba grandemente de acuerdo con las circunstancias. Hacemos la siguiente cita:

" 'Pequeñas limitaciones,' se dice, 'de anteriores derechos existentes, incidentales a la propiedad, pueden imponerse con el fin de impedir un daño manifiesto,' mientras que 'las mayores no podían imponerse excepto por el ejercicio del derecho de expropiación forzosa.' Rideout v. Knox, 148 Mass. 368, 372, 2 L. R. A. 81, 12 A. S. R. 560, 19 N. E. 390, 392; Sawyer v. Davis, 136 Mass. 239, 242, 49 Am. Rep. 27. Se llama la atención a las palabras significativas 'pequeñas limitaciones.' Lo que constituye tales limitaciones debe necesariamente determinarse con referencia a las exigencias de las circunstancias especiales. Así pues, la verdadera destrucción de la propiedad privada de acuerdo con el poder de policía en algunos casos es procedente, aunque una intervención muy pequeña en otras podría considerarse como improcedente. State v. Redmon, *supra*. No hay ninguna prueba específica por la cual pueda medirse con precisión lo que es razonable en un caso determinado. Es una cuestión que descansa en el criterio humano. De modo que la línea que existe entre lo razonable y lo que no lo es, que marca el límite de la autoridad constitucional de la legislatura, es una que a menudo es difícil de precisar y que se hace necesario en todos los casos dudosos que el poder judicial la someta a la sabiduría de la legislatura. Pero cuando claramente se ha pasado del límite, el deber de la corte de rechazar la usurpación y sostener de tal modo la Constitución es absoluto. No tiene ninguna discreción en el asunto. Marbury v. Madison, 1 Cranch 137, 2 L. ed. 60." Otra vez, en la página 496, se dice:

"Debe considerarse que las 'pequeñas limitaciones' en cuanto al disfrute de la propiedad, teniendo relación con la naturaleza del caso, miden el alcance de la intervención de policía. Más allá de eso' está el amplio campo donde el individuo es soberano de modo que no puede penetrarse en él de ningún modo para fines particulares y como se dijo en el caso de Rideout v. Knox, 368, 372, 2 L. R. A. 81, 12 Am. St. Rep. 560, 19 N. E. 390, 392, no para fines públicos excepto por el poder de expropiación forzosa."

Y también, citando del caso *Ex parte Jentzsch*, 112 Cal. 468, 2 L. R. A. 664, se dice:

"El espíritu de un sistema tal como el nuestro está por tanto en completa variación con aquél que más o menos encubierto se encuentra aún bajo el paternalismo de otras naciones. Puede que sea perjudicial a la salud comer pan antes de las 24 horas de su confección, y sin embargo causaría sorpresa ver la legislatura declarar como delito la venta de pan fresco. Vemos con desaprobación tal legislación como también lo hacemos con la vigencia de las leyes suntuarias. Ni siquiera castigamos a un hombre por sus vicios a menos que los practique públicamente, de modo tal que tienda a propagar la corrupción o alterar la paz pública y ocasionar escándalo público. En resumen, damos al individuo la mayor suma posible de libertad personal y garantizado así se le trata como una persona de sano juicio, no como un niño en su minoridad y lo dejamos en libertad para buscar su destino según el impulso, educación y enseñanza, herencia y medio ambiente lo dirijan."

También es pertinente la siguiente cita del caso de *State Ex rel. Sampson* v. *Sheridan*, 1 A. L. R. 958:

"El derecho a seguir cualquiera de las ocupaciones comunes a la vida o a obtener su propia subsistencia en cualquier ocupación inofensiva sin estorbo u obstáculo, es uno de aquellos derechos inalienables comprendidos en las cláusulas de la Declaración de Independencia y garantizado a todos aquellos que viven bajo nuestra forma de gobierno por las cláusulas de la Constitución nacional y las de Estados relativas a la libertad, propiedad y felicidad. 6. R. C. L. página 266 y otros casos."

El caso de *State Ex rel. Lachtman* v. *Houghton*, L. R. A. 1917 F. 1050 es uno que abarca un número de puntos tratados en esta opinión. Allí un municipio con aparente autoridad de la legislatura prohibió la construcción de tiendas en un distrito residencial, o algo parecido a esto. Refiriéndose al caso de *Lawton* v. *Steel*, 152 U. S. 133, la corte dijo que en el ejercicio de sus poderes de policía un Estado no está limitado a las cuestiones que se refieren estrictamente a la salud, moralidad y paz pública pero, como se ha dicho, puede haber intervención siempre que los intereses públicos lo exijan; y en este particular la legislatura tiene necesaria-

mente una gran discreción para determinar no solo lo que exijan los intereses del público sino lo que pueda ser necesario para la protección de tales intereses. Si entonces cualquier negocio llega a tener tal carácter que afecte suficientemente al interés público, puede haber una intervención y reglamentación legislativa en el mismo para obtener el bienestar general, salud y prosperidad del Estado con tal que las medidas adoptadas no estén en conflicto con las prescripciones constitucionales y tengan alguna relación y cierta tendencia a cumplir el fin deseado. La corte resolvió que prohibir al propietario construir una tienda en terreno comprendido en el distrito residencial no podía sostenerse como ejercicio legítimo del poder de policía y también que una ordenanza adoptada de acuerdo con la autoridad legislativa se presume que es válida pero sin embargo debe ser declarada nula si claramente perjudica a los derechos garantizados por la Constitución (un caso muy interesante).

Cuando un negocio es ilícito como el negocio de licor, el Estado puede establecer un completo control del mismo. *Scott* v. *Donald,* 165 U. S. 108, donde aparece el sistema de distribución de bebidas de Carolina del Sur.

En Puerto Rico es la Ley Jones, sección 2, párrafo 1, la que prescribe que no se pondrá en vigor ninguna ley que prive a una persona de la vida, libertad o propiedad sin el debido procedimiento de ley, y el derecho a dedicarse a un oficio se ha resuelto que es una especie de propiedad. Es la Enmienda Quinta a la Constitución de los Estados Unidos la que impide que el Congreso pueda intervenir con el trabajo honrado. *Adair* v. *United States,* 208 U. S. 161; *Coppage* v. *Kansas,* 236 U. S. 1; *Adams* v. *Tanner,* 244 U. S. 590.

En el caso de *Coppage* v. *Kansas* se dice que un Estado no podía al designar como "coerción" una conducta que en realidad no lo es, convertir en criminal cualquier ejercicio

de libertad personal o de derechos de propiedad que son normales y esencialmente inofensivos.  En el mismo sentido se enuncia el caso de *Bunting* v. *Oregon,* 243 U. S. 426.

En el caso de *People* v. *Weiner, supra,* se resolvió que la venta de ropa de cama de segunda mano podría ser regulada pero no prohibida y se sostuvo que si bien las cortes no resolverían sobre la sabiduría de ninguna ley relativa al ejercicio del poder de policía, ellas resolverían la cuestión de si tal ley tiene relación substancial al poder de policía, citándose numerosos casos (pág. 1067).  Una corte debe ver para sostener que un estatuto u ordenanza cae dentro del poder de policía, que tiende en cierto modo a evitar delitos o la preservación de la salud, moralidad y seguridad pública. Debe aparecer que tal fin es el que realmente se persigue y que hay cierta relación entre las disposiciones de la ley y tal propósito.

Examinada la cuestión por virtud de estos principios nos sentimos obligados a declarar que la Ley No. 52 del año 1917 es anticonstitucional.  El fin evidente de la ley fué permitir el establecimiento de un monopolio en los municipios de Puerto Rico siempre que así lo creyeran conveniente a lo menos por períodos cortos.  En la ley o en la experiencia que tenemos, nada hay que sugiera que sea necesario para un municipio el impedir enteramente a un carnicero que ejerza su oficio.  Como frecuentemente se ha dicho la prueba de la ley no es lo que se ha hecho sino lo que puede hacerse por virtud de esa autoridad, pero en este caso particular el municipio de Caguas ha llegado hasta el verdadero límite y ha hecho delictivo el ejercicio del negocio de un carnicero llevado a cabo por una persona particular y fué la legislatura de Puerto Rico la que directamente autorizó al municipio para poder imponer un castigo en caso de que cualquier persona tratase de vender carne.

Si se examina también la Ley No. 52 a la luz de la citada

jurisprudencia podrá verse que su concepto fundamental es erróneo. La ley se funda más o menos en la teoría de que el ejercicio de un oficio en vez de ser derecho natural innato en el pueblo en general es una concesión del Estado o de la Municipal. Las autoridades muestran que si bien puede invocarse el poder de policía para corregir abusos perjudiciales a la comunidad, su ejercicio constituye la excepción. El amplio campo del comercio es libre para todo el mundo mientras surja una verdadera necesidad de reglamentación.

La denuncia por su faz revela el hecho sorprendente de que a un hombre se le somete a castigos y penalidades por el sólo hecho de vender carne sin que haya nada que muestre o sugiera que el ganado no ha sido debidamente sacrificado o que la carne en algún modo no es pura o no sirve para la venta, o que el acusado no había cumplido o no estaba dispuesto a cumplir con ninguna reglamentación razonable aprobada por el municipio de Caguas para regular el negocio, o sin que nada aparezca en cuanto a que el negocio como se llevaba se había convertido o tenía el carácter de un estorbo público.

El apelante, sin embargo, levantó otras cuestiones que merecen cierta consideración. Sostiene que la Ley No. 52 ha sido derogada por la legislación de 1919. La antigua ley municipal, incluyendo el artículo 104 de la misma, del cual se hace mención en la Ley 52, fué derogada. Un sistema responsable de gobierno municipal quedó establecido y el cual en lo principal era independiente del control del Consejo Ejecutivo de Puerto Rico. Se confirieron facultades generales al municipio y es por virtud de estas facultades generales que el municipio debe actuar. Entre estas facultades en la ley de 1919 no hay ninguna autoridad directa delegada a las municipalidades para establecer monopolios en la venta de carne. La ley es clara de que en la ausencia de tal autoridad directa un municipio nunca puede establecer un mono-

polio. (Anteriores autoridades, 19 R. C. L. página 15 y siguientes; Dillon on Municipal Corporations, *Passim,* y otras).

Debe revocarse la sentencia y absolverse al acusado.

> *Revocada la sentencia apelada y absuelto el acusado.*

Jueces concurrentes: Sres. Presidente del Toro y Asociados Aldrey, Hutchison y Franco Soto.